DiPASQUALE et al., Appellees and Cross–Appellants,

v.

COSTAS et al., Appellants and Cross–Appellees.

[Cite as *DiPasquale v. Costas,* 186 Ohio App.3d 121, 2010-Ohio-832.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23436.

Decided March 5, 2010.

Bricker & Eckler L.L.P., Mark R. Chilson, and Vladimir P. Belo, for appellees and cross-appellants.

Matre, Matre & Beyke Co., L.P.A., Kerrie K. Matre, and James A. Matre, for appellants and cross-appellees.

---

FAIN, Judge.

{¶ 1} Defendants-appellants, James Costas, D.D.S., Connie G. Hendricksen Trust, Robert Hendricksen, D.D.S., and South Centerville Dental Condominium Association, appeal from a judgment of the trial court declaring, after a bench trial, that plaintiffs-appellees Toni and Charles DiPasquale, D.D.S., are entitled to construct additions to their condominium unit. The DiPasquales have also filed a cross-appeal, challenging the trial court's failure to provide an evidentiary hearing to determine the specific amount of costs and attorney fees awarded as discovery sanctions against defendants-appellants.[1]

{¶ 2} Defendants contend that the trial court abused its discretion in determining that the proposed additions would not cause any damage to condominium property and in ordering an amendment to the declaration expanding the DiPasquale unit and decreasing common-element property percentages of the remaining owners. Defendants further contend that the trial court abused its discretion in concluding that the directors of the South Centerville Dental Condominium Association ("SCDCA") were not properly appointed or elected and that all actions taken by the directors are null and void. In addition, defendants contend that the trial court abused its discretion in determining that they breached fiduciary duties as partners, Ohio not-for-profit corporation members,

---

1. For purposes of brevity, defendants-appellants will be referred to hereafter as "defendants" or by their individual names, where appropriate. The plaintiffs-appellees will be referred to as "plaintiffs" or by their individual names, where appropriate.

directors, and officers. Finally, defendants contend that the trial court abused its discretion in denying recovery on their counterclaims.

{¶ 3} We conclude that the trial court did not err in concluding that the plaintiffs are entitled to construct improvements on their property. The trial court appropriately considered the requirements of the Condominium Act in the context of the parties' multiple roles as partners, co-owners and co-declarants, members and officers of the condominium association, and unit owners. We further conclude that competent and credible evidence supports the trial court's imposition of duties of good faith and fair dealing upon defendants in their roles as partners and directors of a nonprofit corporation. Competent and credible evidence also supports the trial court's conclusion that the directors of the SCDCA were not properly appointed. In addition, we conclude that the trial court did not err in rejecting the defendants' counterclaims, because competent and credible evidence in the record supports the court's findings. Finally, we conclude that the trial court did err in failing to hold a hearing on the amount of attorney fees and costs to be awarded for defendants' discovery violations.

{¶ 4} Accordingly, the judgment of the trial court is affirmed in part and reversed only with respect to the amount of attorney fees and costs awarded with respect to the plaintiffs' motion to compel discovery. This cause is remanded for further proceedings consistent with this opinion.

I

{¶ 5} This case arises from a bitter dispute among two dentists and an oral surgeon who had peaceably co-owned real property for many years. The building that is the subject of the dispute was built in 1973 and contains three office suites: 9346, 9348, and 9350 Dayton–Lebanon Pike. Defendant James Costas is a dentist and occupied the middle suite, which is 9348. Dr. Costas purchased an undivided one-third interest in the premises in 1974. In the same year, Charles DiPasquale rented the rear suite, 9346, which was just a shell. DiPasquale built the entire suite himself and rented it from 1974 until 1985, when he purchased a one-third undivided interest in the entire premises. Robert Hendricksen is an oral surgeon who has occupied the front suite, 9350, since around 1982. An undivided one-third interest in the premises was deeded to Dr. Hendricksen's wife, Connie, in 1985.

{¶ 6} All three doctors testified that they had conducted the property affairs as a partnership since around 1984 and that the partnership was never dissolved.[2]

---

2. Dr. Costas testified that no one attempted to dissolve the partnership until after this lawsuit was filed. There is no mention of an attempted partnership dissolution in any of the documents or materials in the record.

The dentists each paid equally into a dental building fund, which was used to pay for things like water, trash, snow removal, parking lot repairs, real estate taxes, and so forth, with many decisions being made as the result of "driveway talk." At one point, Dr. DiPasquale conducted the financial affairs of the building fund and had signing authority on the fund. There were also patient referrals back and forth, and the dentists helped each other out.

{¶ 7} The dentists also consulted with respect to improvements or additions made to the property. In 1987, Dr. Costas and Dr. Dipasquale divided and walled in a breezeway between their offices to afford more usable space for each office. Dr. DiPasquale paid for all the changes that he added.

{¶ 8} An additional expansion occurred when the parking lot was expanded to the east of the existing parking lot, at Dr. Costas's suggestion. Dr. DiPasquale obtained contractors, and all three dentists contributed to the expanse. Subsequently, in November 1997, Dr. DiPasquale added an expansion to the east side of his building for a business office. He also incorporated the front of the office area for a concrete pad and handicap access, because there was none. This expansion cost approximately $80,000, and the other two doctors did not contribute. No one objected to this expansion, and no written consents were obtained.

{¶ 9} In March 2000, Dr. DiPasquale needed a surgical suite because he was treating more patients who needed to be sedated and bigger and more cosmetic cases. Another treatment room was added, and a concrete pad was added next to Dr. DiPasquale's office, where patients could wait for buses. Dr. DiPasquale also added a concrete pad on the west side of his office and placed a picnic table there where staff could eat lunch. The cost of these improvements was about $80,000, and neither Dr. Hendricksen nor Dr. Costas paid for any part, including the concrete pads. No objections were expressed to this expansion, and no written consent was obtained. Dr. DiPasquale indicated that he had spent $30,000 to $40,000 just for concrete and between $700,000 and $900,000 in basic revisions. The other doctors did not share in these expenses.

{¶ 10} Before and after the addition was complete, Dr. Hendricksen came to Dr. DiPasquale's office, administered sedation to Dr. DiPasquale's patients, and collected fees for that. Furthermore, unlike the other two offices, Dr. DiPasquale's did not have a concrete walkway or a protective overhang for the entrance.

{¶ 11} During the 1990's, the idea of a condominium was briefly investigated. Dr. DiPasquale consulted an attorney, with the approval of the other partners, but nothing transpired. Subsequently, in late June 2006, Dr. Hendricksen's daughter, Amy, asked attorney Hans Soltau to do some work on a condominium. Soltau never met with either Dr. DiPasquale or Dr. Hendricksen, but may have met with Dr. Costas. Soltau prepared articles for an Ohio not-for-profit corporation, bylaws, and condominium declarations, but never met with the dentists to

review the documents or to discuss condominium law. The dentists and their wives signed the condominium documents in October and November 2006. At the time, Connie Hendricksen owned her husband's unit, and her interest was deeded to the Connie Hendricksen trust. Dr. DiPasquale deeded the condominium property to his wife, Toni DiPasquale, and retained a survivorship interest. During the course of subsequent litigation, Dr. Dipasquale was added back to the deed, with both spouses retaining a survivorship interest. Soltau failed to file any deeds transferring any ownership interests in the property with the Montgomery County Recorder until June 20, 2007.

{¶ 12} The articles of incorporation were signed only by Dr. Costas. Soltau also failed to file the articles with the state of Ohio until after he learned that a lawsuit had been filed in February 2008, disputing the existence of the condominium association. During the meantime, the three dentists had continued operating as partners and conducted matters in the way they always had. No meetings of the SCDCA were held, no board members were elected, no records were kept, no budget was prepared, and no architectural review committee was formed.

{¶ 13} Dr. Robbins is another dentist who had rented the middle unit from Dr. Costas for many years prior to the formation of the SCDCA. In July 2007, Dr. Robbins painted the exterior of Dr. Costa's and Dr. Hendricksen's units without receiving approval of the condominium association or from a board of directors. Surveillance cameras were also placed in exterior areas without consent, and planters were installed in Robbins's area without prior approval. Dr. Robbins offered to paint the exterior of Dr. DiPasquale's unit, also, but Dr. DiPasquale said that would not be necessary, because he was probably going to be adding on to the unit.

{¶ 14} In May 2007, the Costases and Dr. DiPasquale had argued about a construction trailer that was parked in the parking lot. Subsequently, in June 2007, Dr. Costas signed a new signature card with Liberty Bank, superseding the prior card of 1999. Dr. Costas indicated on the signature card that he was the sole owner of the dental building fund, and gave signing authority to himself and Dr. Hendricksen's daughter, Amy.

{¶ 15} In the summer of 2007, Dr. DiPasquale discussed expansion plans with Dr. Costas. Dr. DiPasquale wanted to add two small areas for a total of 650 square feet to his office. The additions would only enclose the concrete pads that Dr. DiPasquale had previously paid for and would not extend into the parking lot. One addition would enlarge the current reception room for the safety and comfort of patients, who were crowded into too small a space. The second expansion would be for a dental lab and small staff area, to improve the sterilization area, and to safely store nitrous oxide and oxygen. Due to overcrowded conditions, oxygen tanks and oxygen lines were running across hot installations in a lab area.

These improvements were necessary for the health, safety, and welfare of patients. In early July 2007, Dr. DiPasquale showed Soltau the plans for the expansion. Soltau indicated that consent of the other owners would be needed, but Dr. DiPasquale did not agree.

{¶ 16} In August 2007, Dr. DiPasquale received a zoning certificate from Washington Township, which certified that the building plans met zoning requirements and that parking was adequate. After building permits were in place, Dr. DiPasquale's contractor, William Hibner, removed the handicap ramp for Dr. DiPasquale's office and began preparing the area for the addition on the east side of the building, which was to be the enlarged waiting room. This was at the very end of the three-unit building. The lab was going to be built on the west side of Dr. DiPasquale's office, which adjoined the unit owned by Dr. Costas and rented by Dr. Robbins. As part of the plans, Dr. DiPasquale was going to construct and pay for a new handicap ramp for Dr. Costas's unit, as well as repairs to the roof and the asphalt areas abutting the construction.

{¶ 17} After construction began, Dr. Costas came out of the building on October 5, 2007, parked his car in front of the addition, and stopped Hibner from proceeding. Dr. Costas did not say that he was in the process of converting to a condominium. He told Hibner: "He'll build over my dead body."

{¶ 18} In November 2007, Dr. DiPasquale sent letters and copies of the drawings for the proposed additions to both Dr. Costas and Connie Hendricksen and explained that he wished to enclose only areas he had already expanded into years ago. Both Dr. Costas and Connie Hendricksen testified that they would never consent to any alterations to Dr. DiPasquale's unit, under any circumstances. However, both Dr. Hendricksen and Dr. Costas also testified that the lab addition was necessary for the safe practice of dentistry. Dr. Costas stated that Dr. DiPasquale would have to move out and buy another building if he wanted more office space. In addition, Dr. Costas testified that he hated Dr. DiPasquale.

{¶ 19} After November 2007, things deteriorated even more. In January 2008, Dr. Costas signed another signature card with the bank, designating Dr. Hendricksen's daughter and himself as account owners and signatories on the dental building fund, which he classified as a sole proprietorship. Dr. and Mrs. DiPasquale then filed suit in early February 2008 against Connie Hendricksen, Dr. Costas, and SCDCA, which was claimed to be a nonexistent entity.[3] Answers and counterclaims, including claims for civil trespass, were filed on behalf of the individual and corporate defendants. The same attorneys represented both the

---

3. Dr. Hendricksen was added as a defendant in an amendment to the complaint.

individual defendants and the SCDCA, of which Mrs. DiPasquale was a member at the time.

{¶ 20} Over a period of several months, all the dentists engaged in what can only be classified as childish behavior, by taking pictures of each other and the premises, squabbling over the disposal of shingles that had been blown off the roof, installing surveillance cameras, and calling the police about trespassing. At one point, a "wanted poster" was placed in the window of Dr. DiPasquale's office. The poster featured a picture of Dr. Hendricksen, who had been contacted by the police about a criminal-trespassing complaint following Dr. Hendricksen's alleged unauthorized intrusion into Dr. DiPasquale's unit.[4]

{¶ 21} The articles of incorporation were not filed with the Ohio Secretary of State until after the lawsuit was filed. In March 2008, the parties agreed to a temporary restraining order regarding exterior building, conditioned on defendants' posting a bond. The bond was never posted. Subsequently, in May 2008, the trial court overruled the defendants' request for a preliminary injunction. The court concluded that the parties had managed the property and improvements as an informal partnership and that Dr. DiPasquale had previously made modest improvements without objection. The court further found that defendants' failure to comply with the condominium declarations and bylaws had created serious inequities and unclean hands and that defendants had failed to show either irreparable harm or a likelihood of success on the merits.

{¶ 22} Eventually, after amended complaints and amended counterclaims, the DiPasquales asserted claims for failure to establish a corporation that can lawfully act; failure to establish a mechanism to address proposed expansion, breach of the duty of good faith and reasonableness; breach of contract with regard to appointment of an unauthorized board of directors; removal of directors and officers for breach of fiduciary duty and unlawful actions; breach of contract for failure to properly insure, and oppression of minority shareholders. In response, the defendants asserted counterclaims for civil trespass, false-light invasion of privacy with regard to the "wanted poster," tortious interference with a business relationship (an alleged sale of Dr. Costas's condominium to Dr. Robbins), declaratory judgment regarding demolition in the common area, and injunctive relief for harm in design and the appearance of the building.

{¶ 23} In June 2008, Drs. Costas and Hendricksen issued a notice to all board members of a meeting of the board of directors for the SCDCA, pursuant to R.C. 1702.31(A). In the notice, the doctors referred to themselves as two members of the board of directors. The purpose of the meeting was to elect officers and

---

4. Dr. DiPasquale denied participating in the wanted-poster prank.

adopt a budget. The DiPasquales attended and objected to the constitution of the board.

{¶ 24} At the meeting, counsel representing the defendants in the lawsuit served as chair "pro tem." Drs. Hendricksen and Costas nominated and voted for themselves as secretary/treasurer and president, respectively. A draft budget for the next five years was proposed, with operating expenses for 2008 of $17,405. The operating expenses increased to a high of $19,589 per year in 2012. Approximately $10,000 to $11,000 of these amounts consisted of snow removal, which Dr. Hendricksen had previously done for many years at no charge.

{¶ 25} Another meeting was held in September 2008, and the board approved a budget that included operating expenses of approximately $38,155 for 2008, up to a high of $42,943 in 2012. These amounts included $20,000 each year for "legal services" and between $10,000 and $11,255 for snow removal. In contrast, no amounts were allocated for landscaping or for maintenance, cleaning, and lighting of the common areas. As owner of the largest unit, Dr. DiPasquale would have been assessed a proportionately larger amount of the expenses, with a monthly fee of almost $2,000.

{¶ 26} The board adopted the budget at the meeting and also adopted assessment and lien policies providing for collection and action on delinquencies. Fees were to be paid by the first of each month, with the board having the ability to file liens against a unit, whenever fees were not paid within 60 days. The minutes indicate that after enacting these items and also assessing sanctions against the DiPasquales for parking trailers in the parking lot, the board adjourned and went into executive session to address "litigation matters." Again, counsel for the defendants in the lawsuit attended the meeting.

{¶ 27} Dr. DiPasquale testified that he believed these actions of the board were intended to punish him. Subsequently, the DiPasquales moved the court for an order granting permission to deposit monthly condominium assessments into escrow. The court granted the motion in December 2008 and stayed the actions of SCDCA, including filing of liens or enforcement of liens through foreclosure.

{¶ 28} The trial court also issued sanctions against the defendants, based on their failure to preserve evidence of videotaped surveillance. The court awarded the DiPasquales their costs and attorney fees related to bringing the motion to compel and motion for sanctions, but did not set a specific amount. In a later decision, the trial court granted the DiPasquales' motion to preclude introduction of eight minutes of surveillance videos that had been produced during discovery, due to the defendants' willful destruction of video recordings. The court noted that because it had issued its earlier decision, the defendants had produced a user's manual, which indicated that the material could easily have been backed up

to a remote computer, and that defendants knew or should have known this all along, contrary to the position previously taken by defendants.

{¶ 29} In January and February 2009, the trial court conducted a bench trial over the course of six days. The court dismissed the false-light claim at the conclusion of the defense case, based on Dr. Hendricksen's failure to prove damages or causation. The court then issued a decision in May 2009, concluding that Dr. DiPasquale was not required to seek consent to build on the premises, but that even if consent were required, the defendants had breached duties that they owed as partners, declarants, majority stockholders, directors, and officers of the SCDCA. The court ordered that the DiPasquales are permitted to build both additions, and also ordered the DiPasquales to pay defendants $4,556.50 as the value of the square footage consumed by the addition. As a further matter, the court held that defendants are not entitled to relief on their counterclaims.

{¶ 30} Defendants bring this appeal from the judgment of the trial court. The DiPasquales have cross-appealed, based on the trial court's failure to hold an evidentiary hearing on attorney fees and costs.

II

{¶ 31} Defendants' First Assignment of Error is as follows:

{¶ 32} "The trial court erred and abused its discretion when determining that the plaintiffs' addition did not cause any damage to the condominium property and the planned addition for another 470 square feet would cause no damage."

{¶ 33} Under this assignment of error, defendants contend that the trial court abused its discretion in concluding that the additions to the DiPasquale property are improvements. Defendants further contend that the trial court improperly disregarded Ohio condominium law, which prohibits construction or additions or expansions to units without the consent of all unit owners. In response, the DiPasquales argue that the trial court appropriately considered the requirements of the Condominium Act in the context of the parties' multiple roles as partners, co-owners and co-declarants, members and officers of the condominium association, and unit owners.

{¶ 34} In reviewing a trial court judgment after a bench trial, we are "'guided by the presumption' that the trial court's findings are correct." *Patterson v. Patterson*, Shelby App. No. 17–04–07, 2005-Ohio-2254, 2005 WL 1074809, at ¶ 26, quoting *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. We also cannot substitute our judgment for that of the trial court when there is "competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." *Seasons Coal*, 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273. "'"A reviewing court

should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." ' " *Gevedon v. Ivey,* 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, at ¶ 54, quoting *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal,* 10 Ohio St.3d at 81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 35} The decision in this case indicates that the trial court credited the testimony of the DiPasquales, while finding that the testimony of the defendants lacked credibility. In fact, the court classified defendants as "disingenuous at best" with regard to assertions they made about the effect of their partnership. The record contains competent and credible evidence supporting the trial court's factual findings.

{¶ 36} Construction of written contracts is "a matter of law that we review de novo. * * * Our primary role is to ascertain and give effect to the intent of the parties. * * * We presume that the intent of the parties to a contract is within the language used in the written instrument. * * * If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Saunders v. Mortensen,* 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, at ¶ 9. Accord *Courtyards of Crystal Lake Homeowners Assn. v. Bradesca,* Cuyahoga App. No. 90966, 2008-Ohio-6157, 2008 WL 5050131, at ¶ 24.

{¶ 37} In concluding that the DiPasquales did not need to seek approval for improvements constructed on their unit, the trial court relied on Article XVII, Section 17.01 of the Condominium Declaration, which states:

{¶ 38} "Except for improvements constructed by the Declarant, or as specifically permitted herein, no building, fence, wall, sign or other structure shall be commenced, erected or maintained upon the Condominium Property, or any part thereof, nor shall any exterior addition to or change or alteration therein be made, until the plans and specifications showing the nature, kind, shape, height, materials, color and location of the same shall have been submitted to and approved in writing by the Board or its designated representative, as to lawfulness and appropriateness, and as to harmony of exterior design, color and location in relation to surrounding structures and topography. In the event the Board, or its designated representative, fails to approve or disapprove such plans and specifications within sixty (60) days after they have been submitted to it, approval will not be required and these provisions will be deemed to have been fully complied with. The Board may condition such approval upon the requesting Unit Owner's agreement to maintain the same, and such agreement shall be binding on the Unit Owner and the Unit Owner's successors in ownership of the

Unit, notwithstanding any provision of the Condominium Organizational Documents to the contrary."

{¶ 39} Dr. DiPasquale was named a "declarant" in Article I, Section 1.22 of the declaration. Accordingly, the trial court concluded that he did not need consent to construct improvements. The term "improvement" is not defined either in the condominium documents or in Ohio's Condominium Act, which is codified in R.C. Chapter 5311. However, for purposes of taxation of real property, R.C. 5701.02(D) defines an improvement as "with respect to a building or structure, a permanent addition, enlargement, or alteration that, had it been constructed at the same time as the building or structure, would have been considered a part of the building or structure." See also R.C. 1311.01(J), defining "improvement" for lien purposes as "constructing, erecting, altering, repairing, demolishing, or removing any building or appurtenance thereto, fixture, bridge, or other structure."

{¶ 40} In *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425, the Supreme Court of Ohio applied the following "common-sense" definitions of "improvements" to real property:

{¶ 41} "Black's Law Dictionary defines 'improvement' as '[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes.' Black's Law Dictionary (6 Ed.1990), at 757.

{¶ 42} "Webster's Third New International Dictionary (1961) 1138, defines the term as 'a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.'" *Brennaman,* 70 Ohio St.3d at 464, 639 N.E.2d 425.

{¶ 43} Under any of these definitions, the proposed construction is an improvement. The trial court, therefore, did not err in concluding that the proposed additions are improvements.

{¶ 44} Defendants contend, without citing supporting authority, that the term "improvements" was a source of considerable confusion in R.C. Chapter 5311 prior to the 2004 amendments. Defendants further contend that R.C. 5311.01(G) now explains the term improvements by distinguishing between "improvements" and "additions or expansions." R.C. 5311.04(G) states:

{¶ 45} "Subject to rules the board of directors adopts pursuant to division (B)(5) of section 5311.081 of the Revised Code, the board may authorize the use of limited common elements, as distinguished from the common elements and exclusive use areas, for the construction of open, unenclosed patios, hedges,

decks, fences, or similar improvements provided that the improvements are maintained and insured by the owner of the unit to which the limited common area is appurtenant. The construction of an addition to or an expansion of a unit into limited common elements or common elements may not be authorized without the consent of all unit owners."

{¶ 46} We disagree that this part of the Act is designed to alter existing legal definitions of "improvement." The first part of R.C. 5311.04(G) deals with certain types of improvements, like hedges, that may be made in limited common areas with board approval. Other types of improvements, such as additions and expansions, require the consent of unit owners. However, this provision deals with requests of unit owners, not declarants. As is indicated in Article XVII, Section 17.02, "no building, fence, wall, sign, or other structure" may be erected without board approval, "[e]xcept for improvements constructed by the Declarant." Therefore, a declarant does not need to seek consent of the unit owners to construct improvements. As will be explained, this is consistent with the structure of the Ohio Condominium Act, which distinguishes between the roles of developers or declarants and unit owners.

{¶ 47} Defendants argue that Dr. DiPasquale is no longer a declarant, because he conveyed his fee-simple interest to his wife after signing the condominium documents. The deed in question is a quit-claim deed, with a "transfer on death" provision. See R.C. 5302.22. Under R.C. 5302.23(B)(3), the designation of a transfer on death beneficiary has no effect on the present ownership of the real property, and the person designated as a transfer-on-death beneficiary has no interest in the real property until the death of the owner of the interest. However, under R.C. 2103.02, Dr. DiPasquale retained a dower interest in the property, which is an estate for life in one-third of the property. This was not a legal interest, as Mrs. DiPasquale held full legal title to the property. See, e.g., *First Bank Natl. Assn. v. Parker,* Cuyahoga App. No. 88534, 2007-Ohio-3066, 2007 WL 1776422, at ¶ 32.

{¶ 48} Nonetheless, these factors are not controlling for the reasons that follow. As is noted by the DiPasquales in their brief, R.C. Chapter 5311 assigns different roles and rights to developers or declarants, as opposed to unit owners. R.C. Chapter 5311 contemplates a development or control period, during which the developer or declarant constructs and improves the condominium development and then offers condominium units for sale to persons who become "unit owners." The condominium declaration in the case before us provides for such a period, by stating that the development period will be seven years from the date the declaration is filed. Consistent with this development period, Article XVII, Section 17.01 allows declarants to make improvements without the consent of the board.

{¶ 49} Defendants contend that the Ohio Condominium Act does not define "declarants," but the Act encompasses declarants within the meaning of developers, by stating:

{¶ 50} " 'Developer' means any person who directly or indirectly sells or offers for sale condominium ownership interests in a condominium development. 'Developer' includes the declarant of a condominium development and any successor to that declarant who stands in the same relation to the condominium development as the declarant." R.C. 5311.01(S).

{¶ 51} Mrs. DiPasquale was a successor to Dr. DiPasquale and stood in the same relation to the condominium development as he did, because the transfer between the DiPasquales was not a "sale" of the condominium unit. In this regard, R.C. 5311.01(AA) defines a "[s]ale of a condominium ownership interest" as "the execution by both parties of an agreement for the conveyance or transfer for consideration of a condominium ownership interest." There is no indication in the case before us that the transfer was made for consideration, which "is defined as a 'bargained for' legal benefit or detriment." *Sundstrom v. Sundstrom*, Ashtabula App. No. 2005–A–0013, 2006-Ohio-486, 2006 WL 269961, at ¶ 26, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58. The quit-claim deed does not state that the property is being transferred for consideration, nor does the testimony indicate that Dr. DiPasquale transferred his interest for a bargained-for legal benefit or detriment. Likewise, there is no evidence that Mrs. Hendricksen's transfer of her interest to the Connie Hendricksen trust was made for consideration. As a result, no sale of condominium property has taken place for purposes of the declaration and bylaws or for purposes of the Ohio Condominium Act.[5]

{¶ 52} As an additional matter, the property was conveyed back to Dr. DiPasquale during the litigation, and he, therefore, was restored to his position as "declarant" at the time of the trial court's decision, with power to construct improvements on the property without the consent of the board, pursuant to Article XVII, Section 17.01.

{¶ 53} We also note that Dr. DiPasquale retained legal ownership and his role as a declarant, because he did not transfer legal title to the additional property held in common with Dr. Costas and Connie Hendricksen. This property is a 0.9621-acre parcel described in the declaration as "additional property," over which the declarants or developers reserved an option to develop and to add to the condominium property.

---

5. Defendants also indicate that no interest of any condominium ownership has yet been sold.

{¶ 54} The fact that no sale has taken place also means that the Unit Owners Association has never assumed control of the condominium. Article XIV, Section 14.06 states that during the control period, the powers, rights, and duties of the association shall be exercised by a board selected by the declarant. Under Section 14.05, the first meeting of the association is to be held no later than 60 days after 25 percent of the condominium interests have been "sold and conveyed" by the declarant. This is consistent with R.C. 5311.08(C)(2), which provides that the unit owners' association is to meet no later than 60 days after the developer "has sold and conveyed condominium ownership interests appertaining to twenty-five per cent of the undivided interests in the common."

{¶ 55} R.C. 5311.08(C)(1) also indicates that the unit owners' association shall be established no later than the date the deed or other evidence of ownership is filed for record following the first sale of a condominium ownership interest. Until the unit owners' association is established, the developer acts in all instances in which action of the unit owners is authorized. Id.

{¶ 56} Like other sections of R.C. Chapter 5311, R.C. 5311.08(C) contemplates a period of time (the development or control period) during which the property is developed and controlled by the developer or declarants. When the first unit is sold, the condominium owners' association is formed and takes control, subject to certain exceptions in R.C. 5311.08(D), which allow developer control to be extended.

{¶ 57} As was indicated, no "sale" of the condominium interests occurred, as defined by R.C. 5311.01(S), and the SCDCA never assumed control of the property. Dr. DiPasquale, as declarant, and Mrs. DiPasquale, as his successor, were entitled to construct improvements pursuant to Article XVII, Section 17.01, without the consent of the unit owners or the board. The trial court, therefore, correctly held that Dr. DiPasquale is not required to obtain consent for the improvements.[6]

{¶ 58} Defendants' First Assignment of Error is overruled.

### III

{¶ 59} Defendants' Second Assignment of Error is as follows:

{¶ 60} "The trial court erred and abused its discretion by ordering Dr. DiPasquale to prepare an amendment to the declaration expanding the bound-

---

**6.** The trial court alternatively held that even if Dr. DiPasquale were required to obtain consent, the defendants breached fiduciary duties by unreasonably withholding consent. Thus, even if the trial court had erred in finding that no consent was required, the court's decision would nonetheless be upheld if the decision is correct on other grounds.

aries of the DiPasquale unit and decreasing the common element property percentages of the remaining unit owners."

{¶ 61} Under this assignment of error, defendants contend that the trial court erred in ordering the DiPasquales to prepare an amendment altering their percentage of ownership interest. Defendants contend that the consent of all unit owners is required to alter the percentage of ownership under Article 10, Section 10.03 of the declaration.

{¶ 62} After concluding that consent for the additions is not required, the trial court noted that Dr. DiPasquale had, in fact, sought the approval and consent of his fellow declarants, consistent with the parties' course of conduct in the decades before the property was submitted to the condominium regime. The court concluded that the defendants' response to this request was unreasonable and is a breach of their duties of good faith and fair dealing. The court observed that the improvements consist of less than one percent of the entire project property and encompass only the limited common elements adjoining the DiPasquale unit. Thus, the court concluded that the improvements would not alter the unit boundaries of the other units, were de minimus, and would not alter the parties' respective percentage of ownership in common elements. Accordingly, contrary to defendants' representation, the trial court did not order alteration of the percentage of ownership in the common elements.

{¶ 63} In fashioning a remedy, the trial court ordered the DiPasquales to pay the other declarants $4,556.50 as the value of the square footage consumed. The court also ordered the DiPasquales to prepare an amendment relocating the boundary of their unit to encompass their limited common elements. And finally, the court ordered an equitable reallocation of the DiPasquales' share of expenses for the condominium property to reflect the increased size of the unit.

{¶ 64} The DiPasquales respond to the defendants' arguments by noting that the amendment does not reduce the defendants' ownership interests in the common elements, but simply increases the DiPasquales' share of the expense burden for the condominium. The DiPasquales also note that the trial court effectively is requiring defendants to consent to the addition, which is necessary so that the amendment can be recorded in Montgomery County records.

{¶ 65} We agree with the DiPasquales. The trial court's order, properly read, does not increase the DiPasquales' share of the ownership interests in the common elements. Article X of the South Centerville Dental Condominium Declaration discusses ownership of common elements. Section 10.02 allocates the percentage of ownership of the common elements based on a comparison of the square footage of each unit to the total square footage of all units on the date the declaration is recorded. Section 10.03 further provides that the percentage of

ownership cannot be altered except by an amendment unanimously approved by all unit owners.

{¶ 66} The percentage of ownership of the common elements of the property is not based on the comparison of a unit's square footage to the total square footage of the condominium property, including the common areas and individual units. It is instead calculated in light of the square footage of a unit compared to the total square footage of all units on the date the declaration is filed. The formula and this calculation have not been altered by the trial court's order, which relates only to inclusion of the limited common elements within the square footage of the DiPasquale unit. The trial court did not order recalculation of the percentages of ownership, but simply ordered the DiPasquales to pay a larger share of expenses. The court was not even required to do this because the ownership percentages were not increased, nor was the court actually required to order compensation to defendants, as their percentages of ownership were not being decreased. The court appears to have made the award in an effort to do equity to all parties. See, e.g., *Health Alliance of Greater Cincinnati v. Christ Hosp.*, Hamilton App. No. C–070426, 2008-Ohio-4981, 2008 WL 4394738, at ¶ 24 ("In an equitable action involving a breach of fiduciary duty, the trial court has discretion in fashioning an appropriate remedy to protect the interest of the beneficiary").

{¶ 67} Article VII of the declaration describes common elements of the property, which consist of the entire balance of the land and improvements thereon. However, Article VIII describes "limited common elements" that have both general and specific uses and are for the exclusive use of the appurtenant unit. Section 8.02 includes "[t]he entranceways, stairways and stoops * * * for the unit adjoining such entranceway, stairway, and stoop" as limited common elements. The trial court concluded factually that the additions would extend only into the limited common elements of the DiPasquale unit, and there is competent and credible evidence supporting this finding. *Seasons Coal*, 10 Ohio St.3d 77 at 80, 10 OBR 408, 461 N.E.2d 1273. Dr. DiPasquale testified that the additions extended only to the areas where he had previously poured and paid for concrete pads, and these areas are properly considered entranceways and stoops of his unit.

{¶ 68} The trial court observed the premises and concluded that the additions are de minimus. Our review of the evidence indicates that this factual conclusion is supported by competent and credible evidence. The reality is that, childish bickering aside, many thousands of dollars have been needlessly expended on a dispute that ought to have been resolved among the parties. In the end, when an owner of these units sells his or her property, the fair market value will be derived from the square feet available in an owner's unit, not the square feet in

another owner's unit, or from the number of parking spaces available in the lot—which actually are more than adequate, according to zoning authorities.

{¶ 69} Defendants' Second Assignment of Error is overruled.

## IV

{¶ 70} The Third and Fourth Assignments of Error will be considered together, because they both deal with the legality of the SCDCA and actions taken by its board of directors.

{¶ 71} Defendants' Third and Fourth Assignments of Error, respectively, are as follows:

{¶ 72} "The trial court erred and abused its discretion in determining that the condominium association was not properly or legally formed.

{¶ 73} "The trial court erred and abused its discretion in determining that the directors of the South Centerville Dental Condominium Association were not properly appointed and/or elected and that all actions taken by the officers and directors are null and void."

{¶ 74} An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. "[A]n abuse of discretion most commonly arises from a decision that was unreasonable." *Wilson v. Lee*, 172 Ohio App.3d 791, 2007-Ohio-4542, 876 N.E.2d 1312, at ¶ 11. Decisions are unreasonable if they are not supported by a sound reasoning process. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. After reviewing the record and the trial court's decision, we do not find that the trial court acted arbitrarily, unreasonably, or unconscionably.

{¶ 75} In its decision, the trial court assumed, for purposes of argument, that Dr. DiPasquale is required to obtain consent from the SCDCA board for the additions. The court concluded, however, that the SCDCA, as currently configured, is without authority to take any lawful action, because the SCDCA was not properly incorporated. The court also held that the board was not properly elected by SCDCA members at a properly noticed and lawful meeting of the SCDCA members. And finally, the court concluded that Dr. Hendricksen is not among the class of persons eligible to serve on the board of directors.

{¶ 76} Defendants contend that the condominium exists as a form of property ownership and does not require the filing of a corporate status. However, this argument misinterprets the trial court's ruling. The court did not conclude that the South Centerville Dental Condominium does not exist as a form of property

ownership; the court held, instead, that the Condominium Association—the SCDCA—was not properly formed.

{¶ 77} In Section 1.07, Article I, the South Centerville Dental Condominium Declaration defines the SCDCA as an Ohio not-for-profit corporation. Section 1.10, Article I, further indicates that SCDCA and its bylaws are subject to the provisions of R.C. Chapter 1702. Article I of the SCDCA Bylaws, which are attached to the Declaration, states that the SCDCA shall be an Ohio not-for-profit corporation.

{¶ 78} R.C. 1702.01(C) defines a nonprofit corporation as "a domestic or foreign corporation that is formed otherwise than for the pecuniary gain or profit of, and whose net earnings or any part of them is not distributable to, its members, directors, officers, or other private persons." R.C. 1702.04(A) further provides that "[a]ny person, singly or jointly with others, and without regard to residence, domicile, or state of incorporation, may form a corporation by signing and filing with the secretary of state articles of incorporation * * *." Most importantly, R.C. 1702.04(D) states:

{¶ 79} "The legal existence of the corporation begins upon the filing of the articles or on a later date specified in the articles that is not more than ninety days after the filing, and, unless the articles otherwise provide, its period of existence shall be perpetual."

{¶ 80} The trial court correctly noted that the SCDCA articles of incorporation were not filed with the secretary of state until February 11, 2008, after a lawsuit had been filed challenging the SCDCA's existence. The court also correctly noted testimony indicating that the Articles were filed without the consent of the plaintiffs, or without the consent of the defendants to the untimely filing. Thus, at the time Dr. DiPasquale attempted to obtain consent for the additions, no lawful entity existed.

{¶ 81} Our review of the Articles of Incorporation indicates further defects that the trial court did not discuss. R.C. 1702.06(B) states:

{¶ 82} "The secretary of state shall not accept original articles for filing unless there is filed with the articles a written appointment of an agent signed by the incorporators of the corporation or a majority of them and a written acceptance of the appointment signed by the agent."

{¶ 83} The incorporators of the SCDCA would have been Dr. Costas, Dr. DiPasquale, and Connie Hendricksen, pursuant to Article XIV, Section 14.01, which indicates that the declarant is forming the association to administer the condominium property. The original appointment of the SCDCA statutory agent, which was filed with the original Articles of Incorporation, states that it has been signed by at least a majority of the incorporators of SCDCA. However, the

appointment is signed only by Dr. Costas. The appointment also indicates that Dr. Costas is an authorized representative. However, there is no evidence that the other parties authorized Dr. Costas to sign or to act on their behalf.

{¶ 84} The addendum to the Articles of Incorporation, which was also filed with the Articles of Incorporation, states:

{¶ 85} "Forthwith upon the creation of the Association, the undersigned is creating a condominium under the provisions of Chapter 5311 of the Ohio Revised Code, known as South Centerville Dental Condominium."

{¶ 86} One might question, in view of this language, whether the creation of the condominium was predicated upon the association's first being created.[7] Putting that point aside, however, we note that the addendum filed with the secretary of state does not contain any signatures, and there is no evidence in the record to indicate who, if anyone, signed the addendum.[8]

{¶ 87} The trial court also concluded that the SCDCA lacks an authorized board through which to take action. In this regard, the court reasoned that the declarants have the power to appoint directors to the board during the control period and that the time for conducting a members' meeting for engaging new unit owners has not yet occurred, because the meeting is not to occur under the declaration until at least one unit is sold. The court observed that because none of the units has been sold, the declarants or their partnership control the condominium property.

{¶ 88} The trial court's conclusion is consistent with our observation above that no sale of the units, as defined by R.C. 5311.01(S), has yet occurred. Pursuant to Article XIV of the South Centerville Dental Condominium Declaration, the SCDCA powers, rights, duties, and functions are to be exercised during the control period by a board selected by the declarants. As the trial court noted, this was not done.

{¶ 89} Competent and credible evidence also supports the trial court's conclusion that the board, consisting of Dr. Hendricksen and Dr. Costas, was not properly elected by SCDCA members at a properly noticed and lawful meeting of SCDCA members. No meetings were ever held until June 2008, and even then, the meeting was called pursuant to R.C. 1702.31, which pertains to meetings of

---

7. This is consistent with Dr. Costas's testimony, as noted by the trial court, that "there weren't no condos until then" [referring to the first meeting of the Board of Directors in June 2008, after the lawsuit was filed].

8. Although the SCDCA bylaws were signed by the doctors and their wives, the numbering and content of the bylaws are not the same as the numbering and content of the addendum. For example, the addendum lists the SCDCA powers in Article III, sections (a) through (i). The bylaws, in contrast, list the SCDCA powers in Article II, sections 2.01(a) through (u).

directors—not under R.C. 1702.17, which pertains to meetings of voting members of nonprofit corporations. The meeting that was held, therefore, was not a meeting of SCDCA members.

{¶ 90} Furthermore, the meeting was not properly called even under R.C. 1702.31(A), which authorizes meetings of directors to be called by "by the chairperson of the board, the president, any vice-president, or any two directors." At the time, the declarants were authorized to conduct the affairs of the SCDCA and to appoint members of the board. Instead of properly calling a meeting and appointing members of the board, Drs. Costas and Hendricksen called the meeting, having already designated themselves "as" directors.[9]

{¶ 91} Defendants also challenge the trial court's conclusion that Dr. Hendricksen is not among the class of persons entitled to serve on the SCDCA board of directors. Citing R.C. 5311.08(A)(1) and Section 3.01 of the SCDCA bylaws, defendants contend that Mrs. Hendricksen is entitled to appoint her husband as a director. We disagree.

{¶ 92} R.C. 5311.08(A)(1) provides:

{¶ 93} "Every condominium property shall be administered by a unit owners association. All power and authority of the unit owners association shall be exercised by a board of directors, which the unit owners shall elect from among the unit owners or the spouses of unit owners. If a unit owner is not an individual, that unit owner may nominate for the board of directors any principal, member of a limited liability company, partner, director, officer, or employee of that unit owner."

{¶ 94} Mrs. Hendricksen does not own her unit as an individual; the unit is owned by a trust. The trust could nominate any of the persons specified in the statute, but Mrs. Hendricksen's testimony at trial indicated that the trust does not have any shareholders, partners, officers, directors, or employees. Section 3.01 of the bylaws contains the same limitations on nomination where a unit is owned by a business or fiduciary unit. Accordingly, Dr. Hendricksen was not qualified under either the statute or the bylaws to be a director, and the trial court did not err in finding that he was not among the class of persons eligible to be a SCDCA director. The court also correctly concluded that the defendants breached the SCDCA bylaws by permitting Dr. Hendricksen to serve in that regard.

{¶ 95} Defendants' Third and Fourth Assignments of Error are overruled.

---

9. The addendum to the articles of incorporation appoints the three dentists as directors of the association. But the addendum is unsigned, and the articles of incorporation themselves are signed only by Dr. Costas.

## V

{¶ 96} Defendants' Fifth Assignment of Error is as follows:

{¶ 97} "The trial court erred and abused its discretion as a matter of law when denying defendants' counterclaims."

{¶ 98} Under this assignment of error, defendants list several issues related to the trial court's denial of their counterclaims. The first issue concerns defendants' contention that Dr. DiPasquale was required to obtain the consent of all unit owners. We have already considered and rejected that contention and will not address it further.

{¶ 99} Defendants' second contention is that the DiPasquales violated the terms of the declaration and bylaws by damaging the common elements of the property and are required to restore the property to its original condition.

{¶ 100} The trial court concluded that no damage had occurred to the property, that the proposed improvements do not encroach on the other units or the parking lot, and that the improvements have a de minimus impact on the overall property. There is competent and credible evidence to support the court's factual findings. *Seasons Coal Co.*, 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 101} In the third issue, defendants contend that they are entitled to an injunction and to attorney fees, based on the taking of common-element property. We have already considered and rejected this argument in Part III, above, and will not address it further.

{¶ 102} Defendants' fourth issue for review challenges the trial court's conclusion that Dr. DiPasquale did not commit civil trespass. The elements of civil trespass are (1) an unauthorized intentional act and (2) entry upon land in the possession of another. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 716, 622 N.E.2d 1153. The trial court credited Dr. DiPasquale's testimony, and concluded that he did not intend to trespass on anyone's property. The court also concluded that defendants have only nonexclusive possession of the common elements of the condominium property under Article 9.01 of the declaration.

{¶ 103} Relying again on the argument that Dr. DiPasquale is not entitled to take common-element property, defendants argue that Dr. DiPasquale's actions had no lawful purpose and were an intentional trespass. We have already concluded that the trial court did not err in its conclusions that a declarant is not required to obtain permission prior to construction of improvements on the condominium property. In addition, we conclude that the trial court's factual findings are supported by competent and credible evidence,

particularly because the trial court was in the best position to assess credibility. "The 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *In re J.Y.*, Miami App. No. 07–CA–35, 2008-Ohio-3485, 2008 WL 2699457, at ¶ 33, quoting *Seasons Coal Co., Inc.*, 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 104} Defendants' final issue under this assignment of error is that the trial court erred in rejecting the claim for interference with contract and business interference. These claims were based on the fact that Dr. Costas was not able to sell his unit to his long-time tenant, Dr. Robbins, due to the alleged harassing actions of Dr. DiPasquale.

{¶ 105} "The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 707 N.E.2d 853, paragraph one of the syllabus.

{¶ 106} The trial court concluded that Dr. Costas had failed, by his own admission, to prove the existence of a contract for the sale of the premises, because Dr. Costas and Dr. Robbins never agreed on the price for the condominium, never had a written agreement, and never finalized the terms. There is competent and credible evidence to support these findings, based on Dr. Costas's own testimony. Dr. Costas stated at trial that the parties had agreed on a price. However, the trial court apparently chose to believe the doctor's testimony in his deposition, in which he stated three times that he and Dr. Robbins had never discussed a price.

{¶ 107} "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Wolf v. McCullough–Hyde Memorial Hosp.* (1990), 67 Ohio App.3d 349, 355, 586 N.E.2d 1204.

{¶ 108} The trial court rejected the claim for business interference because Dr. Costas and Dr. Robbins had continued their business relationship as landlord and tenant from 1992 up through the time of trial, with no change in the relationship. Dr. Robbins continued to rent the premises and continued to pay his rent. Because there had been no breach or termination of the relationship, the trial court concluded that Dr. Costas had failed to prove his claim. There is competent and credible evidence in the record to support the trial court's finding.

{¶ 109} Defendants contend, on appeal, that Dr. DiPasquale interfered with "prospective contractual relations," because Dr. Robbins has stated that he will never purchase the unit due to the actions of Dr. DiPasquale. In *GZK, Inc. v. Schumaker Partnership*, Montgomery App. No. 22172, 2008-Ohio-1980, 2008 WL 1838356, at ¶ 130, we noted that the tort of interference with business relationships includes interference with prospective contractual relations, not yet reduced to a contract.

{¶ 110} The trial court concluded, however, in discussing the interference claims, that another failure of proof was Dr. Costas's failure to prove or to mitigate damages. The court noted that the damages are allegedly related to the amount of money Dr. Costas would have received if he had sold the property to Dr. Robbins. However, Dr. Costas still owned the property and had made no attempt to list the property for sale. "The general rule is that an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank* (1999), 87 Ohio St.3d 270, 276, 719 N.E.2d 955.

{¶ 111} The record contains competent and credible evidence to support the trial court's factual findings. Rather than make any attempt to sell the premises, Dr. Costas continued to accept rent in the amount of approximately $2,100 per month, and this pattern continued at the time of trial.

{¶ 112} Accordingly, defendants' Fifth Assignment of Error is overruled.

## VI

{¶ 113} Defendants' Sixth Assignment of Error is as follows:

{¶ 114} "The trial court erred and abused its discretion in determining that the defendants breached fiduciary duties as 'partners, Ohio not-for-profit corporation members, directors and officers.' "

{¶ 115} Under this assignment of error, defendants present four separate issues, three of which relate to the trial court's rulings on fiduciary duties and one that pertains to the court's finding on defendants' failure to procure liability insurance.

{¶ 116} In the first issue, defendants contend that the trial court erred in concluding that the parties operated as a partnership with regard to the common property. Defendants contend that the parties used this term as "lay persons" would and did not have a signed partnership agreement, partnership tax returns, or an agreement to be personally liable for the debts of the other partners.

{¶ 117} As a preliminary matter, we note that the trial court concluded that defendants were "not factually or legally credible" in arguing after trial that their

relationship was akin to "tennis partners" or "bridge partners." The court specifically noted that defendants are "disingenuous, at best, when they assert that the tenants in common were not partners because they did not operate their professional practices, as opposed to their real estate investment, as a partnership." Id. The trial court concluded, as a factual matter, and based on the parties' own testimony at trial, that the parties had operated as a partnership before and after the formation of the condominium regime. Because the court's findings were based on credibility determinations, we must keep the principle in mind that " '[a] finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.' " *Gevedon,* 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, at ¶ 54, quoting *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

{¶ 118} R.C. 1775.05(A) defines a partnership as "an entity of two or more persons to carry on as co-owners a business for profit." R.C. 1775.06 also indicates that a tenancy in common, among other types of joint ownership, "does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of property." However, because "every business relationship is unique, no single fact or circumstance can operate as a conclusive test for the existence of a partnership." *In re Estate of Nuss* (1994), 97 Ohio App.3d 191, 195, 646 N.E.2d 504. Partnership contracts also need not be in writing, but may " 'be proven by showing acts and conduct of the parties from which the fact may be inferred that the parties have agreed to become partners.' " *Brewster v. Bigham,* Lake App. No. 2004–L–113, 2005-Ohio-6071, 2005 WL 3047491, at ¶ 16, quoting *Rumford Ins. Co., Inc. v. Wack* (Mar. 1, 1985), 6th Dist. No. L–84–251, 1985 WL 7056, at *6.

{¶ 119} In the present case, credible and competent evidence supports the finding that the parties, by their acts and conduct, agreed to become partners with respect to the building. Furthermore, inferences are not even required, as the doctors all testified that they considered themselves to be partners with respect to the ownership and operation of the building. The attorney who drafted the condominium documents additionally testified as to his belief that the doctors operated "taxwise" as a partnership.[10]

{¶ 120} There is also evidence in the record that the parties had the authority to bind each other. For example, when the parking lot was expanded, Dr. DiPasquale took responsibility for obtaining contractors for the project on behalf

---

10. This testimony occurred during cross-examination. The attorney had testified that he had "no clue" about how the doctors operated or how they filed their taxes. The attorney was then impeached with a letter he wrote in February 2008, indicating his belief that "taxwise they operated as a partnership."

of the group, and all three doctors paid for the improvement. Finally, the insurance documents list the form of the business as a *partnership*. Notably, these policies were obtained in 2006 and 2007, both before and after the Declarations were signed. There is no evidence that either of the DiPasquales had any role in obtaining insurance coverage or representing the form of the business—this was done by defendants or their agent, Amy Hendricksen. Accordingly, competent and credible evidence supports the trial court's finding that the three dentists were partners.

{¶ 121} Under the second issue, defendants contend that the trial court erred in holding that the SCDCA is a close corporation or analogous to a close corporation. Before addressing this point specifically, we note that in part "D" of its decision, the trial court held that defendants had breached fiduciary duties owed in several capacities: as partners, declarants, majority shareholders in a constructive close corporation, and as alleged directors and officers of the SCDCA.

{¶ 122} A fiduciary duty is generally defined as " '[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.' " *In re Trust of Bernard,* Summit App. No. 24025, 2008-Ohio-4338, 2008 WL 3918058, at ¶ 20, quoting from Black's Law Dictionary (8th Ed.Rev.2004) 545. All the roles that the trial court ascribed to the defendants involve fiduciary duties. Therefore, a finding that the parties occupied even one of the roles would sustain the trial court's decision.

{¶ 123} For example, "[p]artners in Ohio owe a fiduciary duty to one another." *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 306, 631 N.E.2d 1040.[11] Controlling shareholders in close corporations also owe fiduciary duties to minority shareholders. In *Busch v. Premier Integrated Med. Assoc., Ltd.,* Montgomery App. No. 19364, 2003-Ohio-4709, 2003 WL 22060392, we noted:

{¶ 124} "[L]ike partners, controlling shareholders of a close corporation owe a fiduciary duty to minority shareholders, a duty which is violated when the majority takes action it is authorized to take which nevertheless operates to the

---

11. An accounting is the usual remedy for partnership breaches of fiduciary duty, but it is permissive, rather than mandatory. For example, an accounting is " 'unnecessary where it would serve no useful purpose.' " *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 289, 741 N.E.2d 155, quoting *Hanes v. Giambrone* (1984), 14 Ohio App.3d 400, 404, 14 OBR 518, 471 N.E.2d 801 (allowing action for damages for conversion where partners were alleged to have breached their fiduciary duty). In the present case, of course, Dr. DiPasquale was not awarded damages for defendants' alleged breach. The trial court, instead, imposed an equitable remedy.

disadvantage of the minority and was not undertaken in good faith and for a legitimate business purpose." Id. at ¶ 79, citing *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 741 N.E.2d 155.

{¶ 125} We also recognized in *Kleemann v. Carriage Trace, Inc.*, Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, that R.C. 1702.30 imposes fiduciary duties on boards of directors of nonprofit corporations. Id. at ¶ 44. In this regard, R.C. 1702.30(B) provides that directors are to perform their duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

{¶ 126} Good faith is "defined generally as 'honesty in fact in the conduct or transaction concerned.'" *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10, quoting R.C. 1301.01(S). The Supreme Court of Ohio has also defined the term as follows:

{¶ 127} "'A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'" *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 276, 6 OBR 337, 452 N.E.2d 1315, quoting *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus.

{¶ 128} The trial court also imposed fiduciary duties on defendants as developers or declarants. Condominium developers (or declarants) do not owe a general fiduciary duty to owners and purchasers of condominiums. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 284, 617 N.E.2d 1075. However, actions for breach of fiduciary duty may be maintained where there is "an understanding by both parties that special trust and confidence have been reposed in the developer." Id. And of course, developers or declarants will owe fiduciary duties to each other if they are engaged in a partnership.

{¶ 129} Regarding the SCDCA, defendants challenge the analogy of the SCDCA to a close corporation, because close corporations are formed for profit, whereas the alleged corporation in the case before us is not for profit. In *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 548 N.E.2d 217, the Supreme Court of Ohio stated:

{¶ 130} "Typically, a close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market. * * *

{¶ 131} "Close corporations bear a striking resemblance to a partnership. In essence, the ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed. Just like a partnership, the relationship between the shareholders must be one of trust, confidence and loyalty if the close corporation is to thrive. While a close corporation provides the same benefits as do other corporations, such as limited liability and perpetuity, the close corporation structure also gives majority or controlling shareholders opportunities to oppress minority shareholders. For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or pay high rent for property leased from the majority shareholders." (Citations omitted.) Id. at 107–108, 548 N.E.2d 217.

{¶ 132} The court did not mention a "profit" versus "nonprofit" distinction, and it is clear that majority control of a board of directors could enrich itself, for example, by charging fees for items like snow removal that are paid directly to board members, while neglecting maintenance of the common area, to the detriment of minority owners.

■■■■ {¶ 133} Putting this aside, the fiduciary duty is the same whether the relationship is that of shareholders in a close corporation or parties who have engaged in a partnership. The duty is one of " ' "utmost good faith and loyalty." ' " Id. at 108, 548 N.E.2d 217, quoting Donahue v. Rodd Electrotype Co. of New England, Inc. (1975), 367 Mass. 578, 593, 328 N.E.2d 505, quoting Cardullo v. Landau (1952), 329 Mass. 5, 8, 105 N.E.2d 843. Accordingly, the "profit" versus "non-profit" characterization is a distinction without a difference for purposes of the duty that is imposed. Furthermore, even if the trial court had erred in analogizing the relationship to that of a close corporation, any error would be harmless, because fiduciary duties were owed in other capacities.

■■■■ {¶ 134} Furthermore, R.C. 1702.30(B) imposes fiduciary duties, including good faith, on directors of nonprofit corporations. Kleemann, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43. In Health Alliance of Greater Cincinnati, Hamilton App. No. C–070426, 2008-Ohio-4981, 2008 WL 4394738, an alliance was formed to manage several area hospitals. One member withdrew from the alliance and claimed a breach of fiduciary duty. The First District Court of Appeals concluded that the alliance had breached its fiduciary duty to the member by using its superior position to constrain the member's ability to compete, by denying access to its revenue stream, and by using the member's

funds to pay for strategic planning on the alliance's behalf, while refusing to allow the member to engage in its own strategic planning. Id. at ¶ 43. Thus, whether an organization is for profit or a nonprofit, the directors or corporation cannot receive benefits that are denied to a member, nor can they use their position unfairly to harm a member's interests. These principles recognize that whether or not a corporation is organized for the purpose of generating a profit for itself, both types of corporation are normally organized for the purpose of advancing the interests of corporate shareholders or members, and the requirement of fair dealing has at its heart the notion that one group of shareholders or members ought not take unfair advantage of another group, even when using a method to take unfair advantage that would otherwise be lawful; that is, the act would be lawful but for the relationship of the parties as co-shareholders or co-members. If only otherwise unlawful acts were excluded, there would be no need for the doctrine of fair dealing among partners, shareholders or members because otherwise unlawful acts would be precluded without resort to that doctrine.

{¶ 135} In the present case, competent and credible evidence exists to support a finding that the defendants breached fiduciary duties or failed to act in good faith. Defendants convened an illegal board of directors, held unauthorized meetings, improperly excluded plaintiffs from meetings involving "litigation matters," and indicated that defendants would not consider allowing improvements under any circumstances. These actions were arbitrary, were not in good faith, and violated provisions in the declaration and bylaws that govern board meetings and decisions and require the board to act reasonably. Likewise, the articles of incorporation subject the board to the duties outlined in R.C. Chapter 1702, which include fiduciary duties. Finally, defendants changed bank accounts, thereby excluding Dr. DiPasquale, and approved budgets that included significant amounts for questionable expenses, like snow removal, that would enrich some directors at the expense of others. The board also adopted lien and assessment regulations designed to punish Dr. DiPasquale.

{¶ 136} Because competent and credible evidence supports the finding that a fiduciary relationship exists between Dr. DiPasquale and defendants, as partners, developers or declarants, and directors, the trial court did not have to reach the issue of whether a fiduciary relationship existed in the context of a close corporation. Accordingly, even if the trial court had erred in analogizing SCDCA to a close corporation, any error was harmless.

{¶ 137} We also note that other avenues exist for imposing a fiduciary duty or duty of good faith in the context of the case before us. For example, we have held that parties to a joint venture owe each other fiduciary duties, such as a duty of full disclosure and a duty against self-dealing. *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 20, 711 N.E.2d 726. In *Nilavar,* we characterized the plaintiff's

"claims of a business relationship as asserting something akin to partnership, or more specifically, something in the nature of a joint venture. A joint venture is a contractual association in which the parties intend to carry out a common business purpose. * * * A joint venture differs from a partnership in that it is entered into for a single transaction or a limited period of time." (Citation omitted).

{¶ 138} In the case before us, the trial court could also have relied on a concept established by Ohio courts, which hold that every contract contains "an implied duty for the parties to act in good faith and to deal fairly with each other." *Littlejohn v. Parrish,* 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 27. Accord *Macejko v. Ortiz,* Mahoning App. No. 06 MA 158, 2008-Ohio-1188, 2008 WL 697688, at ¶ 23; *Dunina v. Stemple,* Montgomery App. No. 21992, 2008-Ohio-2064, 2008 WL 1914792, at ¶ 12; and *Becker v. Goodyear Tire & Rubber Co.,* Summit App. No. 22900, 2006-Ohio-1484, 2006 WL 786516, at ¶ 13. In *Littlejohn,* the First District Court of Appeals described the duty as follows:

{¶ 139} "As stated by the Restatement Second of Contracts, 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' * * * It also states that bad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" (Footnotes omitted.) 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, at ¶ 26.

{¶ 140} Implicit in the trial court's decision is the fact that Dr. DiPasquale had justifiably expected that the parties would continue to deal with each other as they had over the past two decades or more with respect to improvements to the property, particularly where the foundations for the improvements had been in existence for some time and had been solely paid for by Dr. DiPasquale, not by the other doctors.

{¶ 141} Defendants' third issue for review is that the trial court applied the wrong legal standard in determining defendants' duties. In this regard, defendants make many contentions, most of which we have already rejected. We will address two issues, however. Defendants contend that the trial court imposed duties on defendants under R.C. Chapter 5311 and that the existence of these duties was rejected by the Supreme Court of Ohio in *Belvedere,* 67 Ohio St.3d 274, 617 N.E.2d 1075. This is incorrect. As we noted, *Belvedere* rejected a general fiduciary duty in this situation, but indicated that actions for breach of fiduciary duty may be maintained where there is "an understanding by both parties that special trust and confidence have been reposed in the developer." Id. at 284, 617 N.E.2d 1075. The trial court's factual finding in the case before us

is that the parties had a relationship involving mutual special trust and confidence. There is competent and credible evidence to support this finding.

{¶ 142} Defendants further contend that fiduciary duty does not exist in R.C. Chapter 1702 and that the trial court's imposition of a fiduciary duty is contrary to our holding in *Kleemann*. In *Kleemann*, we concluded that condominium boards of directors do not owe common-law fiduciary duties to their members. *Kleemann*, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 40. We indicated, however, that "resort to a common law duty is unnecessary, since R.C. 1702.30 outlines fiduciary duties that apply to boards of directors of non-profit corporations." Id. at ¶ 43.

{¶ 143} Under this issue for review, defendants also argue that the trial court improperly imposed fiduciary duties on unit members. We agree with defendants that unit members do not owe fiduciary duties to each other. However, the point of the trial court's decision is that the parties occupied several relationships, not just a relationship as unit owners in the same condominium.

{¶ 144} Accordingly, defendants' first three issues for review are without merit.

{¶ 145} Defendants' fourth issue for review challenges the trial court's finding that the SCDCA failed to procure insurance. The trial court did not award damages for this failure.

{¶ 146} Article XX, Section 20.01 of the Declaration provides:

{¶ 147} "As a Common Expense, the Association shall insure itself, the Board, all Unit Owners and Occupants and all other persons lawfully in the possession or control of any part of the Condominium Property, against liability for bodily injury, disease, illness or death and for injury to or destruction of property occurring upon, in or about, or arising from the Common Elements * * *."

{¶ 148} Article IX, Section 9.01(d) of the bylaws contains a similar provision requiring the association to establish and maintain liability insurance on behalf of the association, board, and unit members.

{¶ 149} The declaration was signed in October and November 2006. The insurance documents indicate that the named insured on the insurance policy between June 1, 2006, and June 28, 2008, is Dr. Hendricksen, and the form of the business is designated as a partnership. The property insured on the declaration sheet for the insurance policy is the premises at 9346—9350 Dayton–Lebanon Pike. On June 28, 2008, the named insured was changed to the SCDCA, but nothing else was changed.

{¶ 150} Under Section I of the Commercial General Liability Coverage Form, the insurer agrees to pay "those sums that the insured becomes legally obligated

to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Section II defines an insured as follows:

{¶ 151} "1. If you are designed in the Declarations or Change Endorsement as:

{¶ 152} "a. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

{¶ 153} " * * *

{¶ 154} "d. An organization other than a partnership or joint venture, you are an insured. Your 'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders."

{¶ 155} The testimony indicated that the DiPasquales were denied coverage, at least in part, because they were not named insureds under the policy of insurance. The trial court, therefore, concluded that the defendants had breached their obligation to provide insurance coverage. The court also concluded that Dr. DiPasquale had failed to prove damages.

{¶ 156} To the extent that the dental business was designated a partnership on the policy and that Dr. DiPasquale is a partner of the named insured, Dr. Hendricksen, Dr. DiPasquale was arguably an "insured" under the policy between June 2006 and June 2008. After June 28, 2008, the defendants breached the requirements of the declaration and the bylaws by listing only SCDCA as the named insured. The only individuals covered at that point would have been the directors, not the unit owners or occupants. The trial court, therefore, did not err in concluding that defendants failed to provide appropriate insurance coverage. We note that defendants' arguments and purpose in challenging the trial court's holding are unclear, particularly in light of the trial court's failure to award damages for the breach.

{¶ 157} Defendants' Sixth Assignment of Error is overruled.

## VII

{¶ 158} The DiPasquales' sole cross-assignment of error is as follows:

{¶ 159} "The trial court erred when it failed to allow an evidentiary hearing to determine the specific amount of costs and attorney fees awarded in its decision, order and entry granting plaintiffs' motion to compel and for sanctions."

{¶ 160} Under this cross-assignment of error, the DiPasquales contend that the trial court erred in failing to allow an evidentiary hearing to determine the amount of attorney fees and costs that should be awarded as sanctions for

defendants' failure to provide discovery. Defendants did not appeal from the award of sanctions, so the propriety of the award is not at issue.

{¶ 161} Civ.R. 37(A) provides that parties may file motions for orders compelling discovery. If the motion is granted, Civ.R. 37(A)(4) provides:

{¶ 162} "[T]he court shall, after opportunity for hearing, require the party or deponent who opposed the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust."

{¶ 163} In November 2008, the DiPasquales filed a motion to compel the production of surveillance video from July 2008 to the present. The DiPasquales alleged that defendants had compiled and destroyed hundreds of hours of videotape, but had produced only eight minutes of footage. Defendants responded by claiming that the video had been written to a hard drive, which overwrites any video that is more than two weeks old. The defendants claimed that copying the content of the hard drive would take ten hours, apparently for each 24–hour period, would require 14 to 15 flash drives, and would necessitate the hiring of a full-time person. The DiPasquales subsequently presented evidence that several weeks of data could be copied in less than two hours, with the purchase of a hard drive and USB cord at an approximate cost of $110.

{¶ 164} In mid-December 2008, the trial court granted the motion to compel, contingent on the condition that the plaintiffs pay for the $100 upgrade by check. This would have allowed plaintiffs to retrieve videotape only from the most recent two-week period, because the other videotape had been already been overwritten and destroyed, according to defendants' testimony.

{¶ 165} As a separate matter, the trial court issued sanctions against defendants for failure to preserve evidence. This part of the decision relates to the hundreds of hours of videotape that had already been erased, which could have shown whether traffic flow in the area would have been impacted by the expansion. The trial court concluded that defendants should have taken steps to preserve the evidence after plaintiffs requested it. Instead, defendants failed to cooperate and failed to consult with anyone capable of preserving the footage, to verify the cost and time involved. The court, therefore, awarded plaintiffs the costs and attorney fees related to bringing the motion to compel and motion for sanctions. The court did not set a hearing date for the motion.

{¶ 166} Subsequently, in late December 2008, the plaintiffs filed a motion in limine to preclude introduction of any surveillance video at trial. The motion was based on the alleged unreliability of the videotapes. The plaintiffs produced

evidence from a security company indicating that the videotape footage had been altered. In mid-January, plaintiffs filed an additional motion in limine to preclude the introduction of any surveillance videotapes. The plaintiffs noted that after the trial court's decision on the motion to compel and sanctions, defendants had produced the user's manual for the surveillance system. The manual indicated that electronically stored video could be readily stored by connecting to a computer in a remote location via the Internet and storing a back-up copy of the footage.

{¶ 167} In responding to the motion, defendants contended that plaintiffs had not paid the $100 for the upgrade and that Dr. Hendricksen did not have Internet access. The trial court granted the motion in limine in mid-January 2009, and rejected these arguments. The court noted first that the evidentiary issue would normally be moot, due to the previous ruling on the motion to compel and for sanctions. However, new information had surfaced in the form of the user manual for the surveillance system, which provided yet another means of preserving the material. The court observed that Dr. Hendricksen would not have been unduly burdened by having to establish an Internet connection to comply with discovery. The court further noted that defendants' failure to preserve the data, coupled with possession of two different methods of preservation that were not unduly burdensome and their lack of concern for preservation of evidence, required exclusion of all surveillance video.

{¶ 168} In arguing that the cross-assignment of error should be over-ruled, defendants focus on various facts that are not in the record, like the existence of video showing Dr. DiPasquale hitting a video surveillance camera with a broom. To the extent that such allegations are not in the record, we ignore them. See, e.g., *Knoop v. Knoop*, Montgomery App. No. 22037, 2007-Ohio-5178, 2007 WL 2821508, at ¶ 2. " 'It is axiomatic that an appellate court will not consider matters outside of the appellate record.' " *Woods v. Cobbins*, Montgomery App. No. 20295, 2004-Ohio-5767, 2004 WL 2429801, at ¶ 13, quoting *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 509, paragraph one of the syllabus.

{¶ 169} Regarding the issue of the sanctions, we have held that a trial court must grant a party's request for reasonable expenses absent "an express finding that the failure to comply was substantially justified or that other circumstances would make an award unjust." *Mays v. Dunaway*, Montgomery App. No. 19922, 2003-Ohio-6900, 2003 WL 22972504, at ¶ 128. See also *MaCarthy v. Dunfee* (1984), 19 Ohio App.3d 68, 70, 19 OBR 151, 482 N.E.2d 1291 (noting that sanctions under Civ.R. 34(A)(4) are mandatory and grant a substantial right to parties against whom the discovery process has been abused).

{¶ 170} In the case before us, the trial court held that attorney fees and costs should be imposed, when it granted the motion to compel in mid-December 2008. The court's failure to hold a hearing on fees was an understandable oversight. The trial was scheduled to begin about six weeks later, and the record indicates that the parties were filing many documents. However, the court did err in failing to specify the amount of fees and costs.

{¶ 171} Accordingly, the cross-assignment of error is sustained. The judgment of the trial court will be reversed solely on the issue of the amount of attorney fees and costs to be awarded for plaintiffs' pursuit of the motion to compel discovery.

## VIII

{¶ 172} All defendants' assignments of error having been overruled, and plaintiffs' cross-assignment of error having been sustained, the judgment of the trial court is affirmed in part and reversed in part, solely with respect to the amount of attorney fees and costs to be awarded to plaintiffs in connection with the motion to compel discovery; and this cause is remanded for further proceedings consistent with this opinion.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

DONOVAN, P.J., concurs.

GRADY, J., dissents.

GRADY, Judge, dissenting:

{¶ 173} The trial court committed at least three fundamental errors in its analysis of the issues of law the parties' claims for relief presented and in the relief the court granted on those claims.

{¶ 174} First, the trial court erred when it applied the common-law rule of fiduciary duty to determine the rights and duties of the parties under the condominium declaration they filed. The Supreme Court has held that the rule of fiduciary duty does not apply to such relationships, which are instead wholly and exclusively determined by the terms of the Ohio Condominium Act, R.C. Chapter 5311. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075.

{¶ 175} Second, the court erred in applying the rule of fiduciary duty as it did. The rule applies to the dealings of parties in a relationship out of which the duty arises. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 548 N.E.2d 217; *Gigax v.*

*Repka* (1992), 83 Ohio App.3d 615, 615 N.E.2d 644. The trial court found that the parties owed each other a fiduciary duty arising from their relationship as partners in managing the operation of their building. The court then misapplied that duty to the parties' relationship as co-declarants of a condominium, which involves wholly different rights and duties.

{¶ 176} Third, the court erred in holding that DiPasquale may expand his office because he is a declarant. The condominium declaration provides that the declarants are not restricted from acting on their rights during the development period. However, that exemption confers no affirmative rights vis-a-vis the other declarants. Until title to any one of the condominium units is conveyed, the declaration is no more than an inchoate dedication that permits the owner of the fee-simple interest in the real property to make such conveyances.

{¶ 177} The fee-simple interest in the parcel of real property on which their building is located is held by the parties as tenants in common. Consequently, each owns a complete, though not exclusive, fee-simple interest in the property. Each has a right to possession of the entire property, subject to the equal rights of the others. If a cotenant is kept out of possession by another cotenant, the ousted cotenant may bring an action in ejectment to recover possession. Alternatively, the ousted cotenant may recover the reasonable value of the use and occupation of the land from the cotenant committing the ouster. 20 American Jurisprudence 2d, Cotenance and Joint Ownership (1995), Section 54; 2 American Law of Property (1952), Section 6.13.

{¶ 178} DiPasquale's proposed expansion of his office space will prevent Costas and Hendrickson from exercising their right of possession with respect to those portions of the real property. Ironically, the trial court's order requiring DiPasquale to pay them $4,556.60 in compensation is similar to the relief to which Costas and Hendrickson could be entitled in an ejectment action. However, that does not relieve the errors the court committed in arriving at its judgment.

{¶ 179} The errors the court committed had a synergistic effect, leading the court to impose several further requirements concerning the yet-to-be-formed condominium association, which will not come into being unless and until the units are conveyed to one of the parties as a "unit owner." That prospect appears dim, to say the least.

{¶ 180} I would reverse and vacate the trial court's judgment for the foregoing reasons.