[Cite as *Denmark v. Denmark*, 2015-Ohio-4292.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| SCOT DENMARK | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26438 |
| | : | |
| v. | : | Trial Court Case No. 2010-DR-259 |
| | : | |
| BARRIE DENMARK | : | (Appeal from Domestic Relations |
| | : | Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of October, 2015.

. . . . . . . . . . .

L. ANTHONY LUSH, Atty. Reg. No. 46565, 2160 Kettering Tower, Dayton, Ohio 45423-1001
        Attorney for Plaintiff-Appellee

THOMAS R. SCHIFF, Atty. Reg. No. 39881, 500 Lincoln Park Boulevard, Suite 216, Kettering, Ohio 45429-6412
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Barrie Denmark, appeals from an entry and order granting the motion of Plaintiff-Appellee, Scot Denmark, for clarification of a divorce decree between the parties and reducing the spousal support paid to Barrie for a period of 39 months.[1]   In support of her appeal, Barrie contends that the language of the divorce decree is not ambiguous or unclear, and the trial court, therefore, did not have the ability to modify or clarify the decree.

{¶ 2} We conclude that the trial court did not err in clarifying the decree and modifying Barrie's spousal support.   Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 3} As background leading to the filing of the motion before the trial court, we note the following facts in the record.   On March 12, 2010, Scot filed a complaint seeking a divorce from Barrie.   Both parties were represented by counsel during the proceedings, and a final judgment and decree of divorce was filed on February 7, 2011.   In the decree, the court noted that the parties had entered into an agreement resolving most questions as to spousal support, the division of property, the division of indebtedness, and other matters, and the court approved their agreement.   Only one matter – the marital residence – was the subject of some disagreement.

{¶ 4} Previously, in February 2009, Fifth Third Bank ("Fifth Third") had filed a foreclosure complaint against Scot and Barrie in connection with a home they owned at

---

[1] For purposes of clarity, we will refer to the parties by their first names.

528 Misty Morning, Dayton, Ohio. Fifth Third held two notes and mortgages on the property. Both parties had signed the first note, which was entered into in 2003, for an original principal amount of $367,500. Both parties were jointly and severally liable on the note, and Fifth Third had placed a first mortgage on the residence to ensure payment of the note.

{¶ 5} Both parties had also signed what was called a Consumer Note in the amount of $300,400 in September 2007, and Fifth Third obtained a second mortgage on the property to ensure payment of the note. Both parties again were jointly and severally liable on the Consumer Note. The February 2009 foreclosure proceeding involved only the Consumer Note.

{¶ 6} In July 2009, Scot and Barrie signed a forbearance agreement, as a result of which Fifth Third agreed not to enforce its rights or take judgment on the Consumer Note so long as Scot and Barrie complied with the terms of the agreement, which required them to pay $2,000 per month beginning July 1, 2009, and continuing on the first of the month thereafter. The agreement was set to expire on January 1, 2010.

{¶ 7} On August 28, 2009, Fifth Third Bank dismissed its foreclosure action against the Denmarks, without prejudice. As was noted, the divorce action was filed on March 12, 2010. On March 31, 2010, Scot and Barrie signed a first amended forbearance agreement, which extended the term of forbearance until October 31, 2010. The Denmarks again agreed to pay $2,000 per month on the obligation, which at that time was $290,817.72.

{¶ 8} On November 22, 2010, Scot and Barrie signed a second amended forbearance agreement, which extended the term of forbearance until April 30, 2011,

again contingent on the payment of $2,000 per month toward the debt, which at that point was $282,369.01. During the divorce proceedings, Barrie continued to live in the Misty Morning home.

{¶ 9} The final divorce decree was filed on February 7, 2011, prior to the time that the second forbearance agreement expired. On February 5, 2011, Barrie sent an email to Scot, indicating that she hoped to know no later than June 1 whether she would be leaving Dayton for a new job or for training for a new career. She also said that she could leave town as early as July 1, 2011. Barrie then made a proposal that she indicated had never been presented to Scot. First, she proposed that she would receive half of his income in spousal support. The second condition involved the house, which had been for sale during the divorce proceedings. In this regard, the email stated:

We will reduce the price of the house immediately and ask Lois to reposition it as: MUST SELL.

With the narrow upturn in the market and the spring selling season upcoming, I think we can sell it by summer's end. Scot, even though both of our attorneys are too lazy to check it out, I have copies of articles in recent ABA journals, under the legal ethics section, showing that the Ohio, NY and Florida bars, among others are, in practice, not theory, permanently preventing new applicants from being able to sit for the bar exam due to foreclosure, bankruptcy and other credit issues. I will have copies of these articles with me in court on Monday. By agreeing to allow the bank to take over the house, I will create a situation where I cannot ever sit for the bar --- and I would like to become an attorney. You certainly understand that I

cannot sign anything to that effect. I am not just being arbitrary. If at the end of the summer selling season the court orders me to allow the house to be returned, I will have to do that with a statement that it is against my wishes and ethical views. As it is now, I am able to explain that the situation was handled without my knowledge, that we hired counsel to work on our behalf to get the banks to allow us to pay and that we would eventually pay the shortfall when the house is sold at a loss.

Plaintiff's Ex. 6, p. 2.

{¶ 10} The email also included a proposed real estate provision which indicated, among other things, that the property was currently listed for sale with a realtor, and that if the property were sold within 7 months, the parties would be equally entitled to the net equity, or would be equally liable for a shortfall if a deficit existed at closing. This provision also stated that "[a]t the end of the 7 months, if there is no sale and no agreement to extend the sale window, the property will be allowed to go into foreclosure, and the parties will share equally in any and all resulting damages or judgments related thereto." *Id.* at p. 3.

{¶ 11} According to Barrie's testimony, her attorney had probably written the real estate provision that was included in the email. As was previously noted, most of the decree was entered pursuant to the agreement of the parties. Regarding the real estate, the decree contained the following provision:

> 3. **REAL ESTATE**: The parties are owners of the real estate located at 528 Misty Morning, Dayton, Ohio 45429. The parties have two debts to Fifth Third Bank associated with this property, with balances

totaling in excess of $600,000.00. As a result of an existing default on the note, Fifth Third Bank filed a foreclosure action against the property, which is still pending. The parties have entered into a forbearance agreement with Fifth Third Bank which has been extended and currently expires in May 2011. The property has been listed for sale for an extensive period and has not sold. On February 6, 2011, the parties instructed the realtor to lower the price to $450,000.

While the court is aware that this is the only issue the parties could not agree upon, and the court having heard the stipulations of the parties, and the concern of the Defendant regarding her desire to sit for the Bar Exam in the future, all these points having been considered, the terms and conditions of this provision are an ORDER of this court not an agreement of the parties.

If the property is sold by July 31, 2011, or before the note extension has ended, the parties shall be equally entitled to the net equity proceeds from the sale, or if there is a deficit at the time of sale or disposition, the parties shall be equally liable for any shortfall at the time of closing or judgment. The parties can agree to extend or shorten the sale period from the July 31st date set out above. The Defendant can try to buy out the property just as a third party on or before the note extension fails or by July 31, 2011, from the current creditors, and the Plaintiff shall reasonably cooperate to allow the purchase. However, any deficit for the Defendant's purchase will be split equally between the parties as if it were a third party

sale. On July 31, 2011, or the expiration of the note extension, whichever shall first occur, if there is no sale and no agreement to extend the sale window, the property will proceed to foreclosure in accordance with the pending foreclosure, and the parties will share equally in any and all related damages or judgments related thereto. Neither party will be required to pay any further monies toward said property after July 31, 2011, except as same may be ordered in any foreclosure proceeding.

During the pendency of the sale, the parties shall equally split the mortgage and commercial loan obligations, the homeowners insurance and the real estate taxes, in addition to the community/homeowner fee assessments. All utilities and other expenses shall be the sole responsibility of the Defendant and she shall hold the Plaintiff harmless and blameless thereon until any closing or the occurrence of the loss of the forbearance extension or July 31, 2011 whichever shall first occur. To the extent she hasn't already done so, the Defendant shall immediately place all utilities or services for the home in her sole name. However, any realtor recommended repairs shall be split equally by the parties at the time they are incurred. In addition, any property maintenance related to preparing the house for sale shall be limited to $1,500.00 per person per year to be the equal responsibility of the parties.

Any taxes associated with a sale or foreclosure shall be shared equally by the parties. The parties shall split the tax deductions associated with the property equally.

Final Judgment and Decree of Divorce, Doc.# 17, pp. 2-3.

{¶ 12} Under the divorce decree, Barrie was also given spousal support of $17,500 per month from March 1, 2011 through July 31, 2011 or until she was employed, whichever occurred first. Spousal support after that time was to be $16,200 per month until the death of either party or Barrie's remarriage. The court also retained continuing jurisdiction over the issue of spousal support.

{¶ 13} After the divorce decree was filed, Barrie lived in the house until July 31, 2011. She then moved to Pittsburgh to attend law school. On April 27, 2011, the parties signed a third amended forbearance agreement with Fifth Third, which extended the term of forbearance until October 30, 2011. The Denmarks again agreed to pay $2,000 per month on the obligation, which at that time was $274,161.92. On July 25, 2011, Scot wrote an email to Barrie regarding his potential purchase of the house as a "short sale" and his attempts to refinance the loans to remove Barrie's name. At that time, Barrie responded that "I will pay my half of the short sale to the bank on a monthly basis or to you based on the rate deal you work out." Plaintiff's Ex. 12, p. 1.

{¶ 14} After Barrie moved out of the house, Scot moved in and continued to negotiate with Fifth Third regarding the restructuring of the loans on the property. In December 2011, both Barrie and Scot signed a fourth amended forbearance agreement, which extended the term of forbearance until October 30, 2012. The Denmarks again agreed to pay $2,000 per month on the obligation, which at that time was $265,383.42.

{¶ 15} In June 2012, Scot authorized his attorney to send a letter to Barrie's attorney, indicating that negotiations with the bank had been unsuccessful and that Scot would be making no further payments on the mortgage. At the time, Barrie was studying

abroad and was not apparently communicating with anyone in the United States.   When Barrie returned, she learned that Scot was no longer making payments on the mortgages. On August 1, 2012, Barrie's attorney sent a letter to Scot's attorney stating as follows:

> It has come to my attention that Mr. Denmark has stopped paying the mortgage on the residence at 528 Misty Morning, Dayton, Ohio 45429 which will in essence allow the house to go into foreclosure.
>
> As you are also aware, there is going to be a shortfall of some amount that the parties will be required to split with respect to one or both mortgages if the house proceeds to foreclosure.

Plaintiff's Ex. 18, p. 1.

**{¶ 16}** The letter proposed that a realtor be obtained so that the house could be rented until a foreclosure action reached its conclusion.   *Id.*   On September 17, 2012, Scot's attorney sent Barrie's attorney a notice from Fifth Third, which indicated the bank's intent to proceed with foreclosure regarding the property.   Scot's attorney asked for a meeting between the attorneys to discuss how to proceed with Fifth Third.   Neither Barrie nor her attorney responded to this letter.

**{¶ 17}** According to Barrie, Fifth Third called and asked her to come in to talk about the loans.   Barrie and her attorney met with the bank on September 20, 2012.   The bank wanted her to bring the Consumer Note loan (which had been subject to the forbearance agreements) current so that it appeared current on their books for that quarter.   In exchange, Fifth Third would release Barrie from any liability on the Consumer Note. Barrie did not inform Scot of either her meeting or the proposed agreement with the bank, because the bank wanted the transaction to be confidential.

**{¶ 18}** On September 27, 2012, Barrie signed a settlement agreement with Fifth Third. In exchange for paying $6,000 immediately, and paying an additional $2,000 on or before October 15, 2012, Fifth Third released Barrie only from liability on the Consumer Note. The agreement also contained a confidentiality clause, which prohibited both parties from disclosing the terms of the agreement to anyone other than their attorneys, financial advisors and employees "on a need to know basis, unless ordered to disclose such terms and conditions by a court of valid jurisdiction." Plaintiff's Ex. 20, p. 2. Barrie never notified Scot or his attorney of this agreement. Fifth Third also never filed the release with the county recorder.

**{¶ 19}** In September 2012, Barrie contacted a realtor to put the house on the market. On October 15, 2012, Fifth Third filed a complaint for foreclosure against Scot and Barrie, but only with respect to the first note and mortgage, not the Consumer Loan that was the subject of the forbearance agreements, and for which Barrie had been released.

**{¶ 20}** The house was subsequently sold. According to a closing statement dated January 18, 2013, the selling price was $403,000. The closing statement indicates a payoff of the first mortgage to Fifth Third in the amount of $335,392.55, and a payoff of the second mortgage (on the Consumer Note) to Fifth Third in the amount of $60,000. Plaintiff's Ex. 22. Fifth Third's first and second mortgages on the property were released in early February 2013. *See* Plaintiff's Exs. 23 and 24.

**{¶ 21}** About a week after the mortgage releases were filed, Scot's attorney notified Barrie's attorney that Fifth Third was demanding payment on the Consumer Note in the amount of $256,836, including $800 in fees. *See* Plaintiff's Ex. 25. Barrie did not

respond to this letter. On February 25, 2013, Scot's attorney sent another letter to Barrie's attorney, asking that they work together to resolve the debt to Fifth Third. No response was received to this letter, either.

{¶ 22} Thereafter, Scot negotiated with Fifth Third to resolve the matter. On July 29, 2013, Scot's attorney sent another letter to Barrie's attorney, indicating that Fifth Third had agreed to a reduction of the outstanding Consumer Note amount, and that the first installment of out-of-house attorney fees of $1,813.98 had been paid. Scot's attorney asked for reimbursement of half of this amount. The letter further noted that effective September 1, 2013, monthly payments of $4,000 per month would be required for 41 months. Plaintiff's Ex. 29, p. 1. Scot's attorney proposed that the spousal support order be changed to allow for direct payment to Fifth Third of one-half this amount, and he attached an Agreed Order to that effect. *Id.*

{¶ 23} On August 6, 2013, Scot filed a verified motion with the trial court, asking the court to modify the spousal support order to allow direct payments of $2,000 to be made to Fifth Third for Barrie's share of the $4,000 loan repayment. A copy of the motion was sent to Barrie's attorney, again with a request that she contribute.

{¶ 24} At a pretrial held on September 4, 2013, Scot learned about the confidential agreement between Barrie and Fifth Third. Scot then filed an amended verified motion on October 22, 2014. The amended motion contained five branches. The first branch asked the court to allow Scot to make direct payments of $2,000 per month to Fifth Third from Barrie's spousal support; the second asked the court to reduce Barrie's spousal support by $2,000 per month; the third asked for clarification of the divorce decree; the fourth asked for Civ.R. 60(B)(5) relief; and the final branch asked for attorney fees and

any other relief to which Scot was entitled.

{¶ 25} On October 28, 2013, Fifth Third filed a complaint against Scot in connection with the Consumer Note, contending that he owed the principal sum of $208,784.25, plus accrued but unpaid interest through September 17, 2013, and interest after October 30, 2012 at a different rate. After receiving summary judgment in its favor for those amounts, Fifth Third filed a certificate of judgment against Scot with the Montgomery County Recorder. *See* Plaintiff's Exs. 33, 34 and 35.

{¶ 26} On May 21, 2014, the trial court heard testimony from Barrie and Scot, and admitted Plaintiff's Ex. 1-35. After hearing the testimony, the court filed an Entry and Order on September 26, 2014, concluding that two sentences in Section 3 of the divorce decree created an ambiguity with regard to the division of the debt on the martial residence. The court further concluded that reading the decree as a whole, the intended meaning of the order was to subject the debt on the marital residence to equal division. The court found each party liable for $86,000 on the debt for the martial residence, credited Barrie with $8,000 that she had paid, and reduced her spousal support in the amount of $2,000 per month for 39 months, effective October 1, 2014. Based on its findings, the court also concluded that the Civ.R. 60(B) motion was moot. Barrie timely appealed from the judgment of the trial court.

## II. Clarification of Divorce Decree

{¶ 27} Before addressing the merits of this case, we note that Barrie's brief fails to comply with App.R.16(A)(1),(2),(3), and (4), in that it does not contain a table of contents with page references; a tables of cases; "a statement of the assignments of error

presented for review with reference to the place in the record where each error is reflected"; or "a statement of the issues presented for review, with references to the assignments of error to which each issue relates." In such situations, App.R. 12(A)(2) provides that an appellate court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."

{¶ 28} Nonetheless, where the issue an appellant is raising is clear, we have elected to consider the issue. (Citations omitted.) *JP Morgan Chase Bank, N.A. v. Johnson*, 2d Dist. Champaign No. 2014-CA-27, 2015-Ohio-1939, ¶ 8. In the case before us, Barrie appears to contend that the trial court could not modify the property division provision in the divorce decree because the provision was not ambiguous. Therefore, that is the alleged error we will consider.

{¶ 29} Concerning property divisions, R.C. 3105.171(I) provides that:

A division or disbursement of property or a distributive award made under this section is not subject to future modification by the court except upon the express written consent or agreement to the modification by both spouses.

{¶ 30} However, both parties agree that trial courts may clarify ambiguous terms in divorce decrees without violating this statute. We also agree. *See, e.g.*, *McKinney v. McKinney*, 142 Ohio App.3d 604, 608, 756 N.E.2d 694 (2d Dist.2001); *McConnell v. McConnell*, 2d Dist. Champaign No. 09-CA-43, 2010-Ohio-4757, ¶ 24. "An ambiguity exists when a provision in an order or decree is reasonably susceptible of more than one

meaning." *McKinney* at 609.

{¶ 31} In this regard, we have stressed that:

" 'If there is good faith confusion over the interpretation to be given to a particular clause of a divorce decree, the trial court in enforcing that decree has the power to hear the matter, clarify the confusion, and resolve the dispute.' " (Citation omitted.) *Browne v. Browne*, 2d Dist. Greene No. 02CA117, 2003-Ohio-2853, ¶ 12, quoting *Quisenberry v. Quisenberry*, 91 Ohio App.3d 341, 348, 632 N.E.2d 916 (2d Dist.1993). For a reviewing court, the issue is whether the trial court, in clarifying the confusion, abused its discretion – that is, whether the trial court made the decision with an " 'unreasonable, arbitrary, or unconscionable' " attitude. *Browne* at ¶ 13, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

*Printz v. Printz*, 2d Dist. Darke No. 2013-CA-2, 2013-Ohio-5344, ¶ 8.

{¶ 32} After reviewing the divorce decree, we conclude that the trial court did not abuse its discretion by finding the decree ambiguous. As an initial point, the foreclosure proceeding was not pending during the divorce proceedings or when the decree was filed. This is contrary to the statement in the first paragraph of Section 3 of the divorce decree. Thus, confusion was introduced into the decree at the very beginning of Section 3, through reference to an event that did not exist.

{¶ 33} The trial court also found two sentences in Section 3 ambiguous. These sentences, which are contained in the third full paragraph of Section 3, state that:

On July 31, 2011, or the expiration of the note extension, whichever shall

first occur, if there is no sale and no agreement to extend the sale window, the property will proceed to foreclosure in accordance with the pending foreclosure, and the parties will share equally in any and all related damages or judgments related thereto. Neither party will be required to pay any further monies toward said property after July 31, 2011, except as same may be ordered in any foreclosure proceeding.

{¶ 34} The parties contemplated that by July 31, 2011, a sale extension would be granted, or the property would be sold (which was unlikely since it had been for sale for an extended period of time), or the property would proceed to the pending foreclosure. While this latter alternative was most likely, there was no pending foreclosure.

{¶ 35} A reasonable interpretation of the statement about paying further monies "toward" the property is that in the event of foreclosure, neither party would have to continue making payments for the property, including mortgage payments, taxes, homeowner association fees, utilities, and pool maintenance and upkeep – all of which Scot testified were involved. This interpretation is consistent with the fact that the paragraph of Section 3 following immediately thereafter outlines the parties' obligations to equally split the homeowners' insurance, mortgage payments, real estate taxes, and commercial loan obligations during the pendency of a sale.

{¶ 36} Another interpretation, advanced by Barrie, is that unless she was ordered to pay money pursuant to a foreclosure proceeding, she had no liability for anything after July 31, 2011. This is inconsistent with statements that the parties were to equally share in the net profit or the deficits resulting from the sale or foreclosure of the property. In view of this lack of clarity in the property division provision, the trial court was entitled to

interpret the provision, as it did, in view of the entire decree, and to conclude that "the debt on the marital residence was subject to equal division, just as the proceeds of the property were to be shared equally." Doc. #44, p. 4.

{¶ 37} As a further matter, we note that the trial court reserved continuing jurisdiction over the spousal support order. "A trial court has the authority to modify the amount of spousal support if the court determines that 'the circumstances of either party have changed' and the decree (as it did here) contains a provision authorizing the court to modify the amount or terms of spousal support." *Allread v. Allread*, 2d Dist. Darke No. 2010 CA 6, 2011-Ohio-1271, ¶ 19, quoting R.C. 3105.18(E). "A change of circumstances 'includes, *but is not limited to*, any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses.' The burden of showing that a reduction of spousal support is warranted is on the party who seeks the reduction." (Emphasis added.) *Id.*, quoting R.C. 3105.18(F). (Other citation omitted.) Again, in this situation, we review the trial court's decision for abuse of discretion. *Id.*

{¶ 38} The fact that Barrie would obtain a release from Fifth Third Bank on a debt of close to $300,000, prior to the sale of the house and by paying only $8,000, was clearly not contemplated at the time of the divorce. Her failure to disclose her actions prior to the sale of the property was also not contemplated at the time of the decree. By concealing her actions, she deprived Scot of the ability to fully protect his interest in their jointly-held property. Furthermore, Barrie's actions constituted a substantial change in circumstances, since Barrie was jointly and severally liable for the debt, and the decree, as noted, contemplated that the parties would equally share in the net profit or in any liability pertaining to the house and the notes and mortgages on the house.

**{¶ 39}** Accordingly, even if the decree had been clear, the trial court could have modified the spousal support based on a change in circumstances. We note that Scot's motion asked the trial court to reduce Barrie's spousal support, and the trial court's entry and order found the motion for reduction of spousal support to be well-taken. Doc. #44, p. 6. We find no abuse of discretion in the trial court's decision.

**{¶ 40}** Accordingly, Barrie's assignment of error is overruled.


## III.   Conclusion

**{¶ 41}** Barrie's sole assignment of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . .


FAIN, J. and HALL, J., concur.


Copies mailed to:

L. Anthony Lush
Thomas R. Schiff
Hon. Timothy D. Wood