[Cite as *Passage v. Passage*, 2016-Ohio-1097.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| TERI M. PASSAGE | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2015-CA-36 |
| | : | |
| v. | : | Trial Court Case No. 2013-DR-190 |
| | : | |
| JONATHAN M. PASSAGE | : | (Domestic Relations Appeal) |
| | : | |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of March, 2016.

. . . . . . . . . . .

MICHAEL A. MAYER, Atty. Reg. No. 0064079, 510 West Main Street, Fairborn, Ohio 45324
      Attorney for Plaintiff-Appellee

DAVID S. PETERSON, Atty. Reg. No. 0007836, ROBERT K. HENDRIX, Atty. Reg. No. 0037351, 87 South Progress Drive, Xenia, Ohio 45385
      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

    **{¶ 1}** In this case, Defendant-Appellant, Jonathan Passage, appeals from a trial

court judgment finding him and his ex-wife, Teri Passage, both in contempt.[1] In support of his appeal, Jonathan contends that the trial court abused its discretion by finding him in contempt when Teri did not have clean hands. Jonathan also contends that the court erred in ordering him to pay Teri one-half of the profits from the sale of a van, without offsetting costs that he incurred. In addition, Jonathan contends that the trial court abused its discretion regarding awards of attorney fees, and erred in making a post-decree modification in the parties' separation agreement.

{¶ 2} We conclude that the trial court erred in failing to offset the costs incurred in selling the van. The court also erred in modifying the terms of the separation agreement to require that the parties would each be responsible for one-half of the mortgage costs and expenses on the marital residence until it sold. The court did not err in finding Jonathan in contempt, or in its award of attorney fees to each party. Accordingly, the judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 3} In August 2013, Teri filed a complaint for divorce from Jonathan, and he then filed an answer and counterclaim for divorce. In July 2014, the parties entered into a separation agreement that was incorporated into a final divorce decree filed on August 12, 2014.

{¶ 4} At the time of the divorce, the parties jointly owned a marital residence located at 1115 Stanwick Drive, in Beavercreek, Ohio. Under the terms of the separation agreement, Teri was given the Stanwick residence, and upon the filing of the divorce

---

[1] For purposes of convenience, we will refer to the parties by their first names.

decree, she was to assume sole liability for timely paying the mortgage obligation, real estate taxes, insurance, utilities, maintenance costs, and improvements for the home. She was also required to hold Jonathan harmless on these obligations.

{¶ 5} Under the agreement, Teri had 90 days to refinance the mortgage and pay Jonathan $16,000, which represented his share of the equity. If Teri were unable to refinance, the property was to be listed for sale, and upon sale, Jonathan was to receive the first $6,000 from the sale profits. Each party would then receive an equal share of the profit thereafter. At the time the agreement was made, the parties contemplated that Teri's parents would co-sign a loan for the refinancing and would help her with a down payment so that she could stay in the house.

{¶ 6} Difficulties quickly arose, and matters became complicated based on the parties' animosity towards each other and unwillingness to communicate or cooperate. Within a few days after the decree was filed, Teri learned that she was unable to obtain financing. She and her father began looking for property in mid to late August 2014, and on September 5, 2014, Teri filed a notice with the court, indicating that she was relocating to a house that her father had purchased in the area. Teri did not tell Jonathan directly that she was vacating. Teri vacated the premises gradually, between September 20 and October 10, 2014.

{¶ 7} Teri had been a licensed realtor since 2014. When she was unable to refinance the loan, she contacted a realtor, Vanessa B., in mid-August 2014, and asked for a comparable market analysis and listing presentation. Teri learned that the house was valued at about $154,000, and that if she refinanced an additional $16,000 to pay Johnathan, the debt to value ratio on the home would be severely undercut. Vanessa

sent listing documents to Teri and Jonathan, but he refused to sign, because he wanted to check out other realtors. He also believed that the terms of the separation agreement prevented him from listing the property for sale until the 90-day refinancing period had elapsed. Teri subsequently sent Jonathan an email through a court-ordered communication system called "Our Family Wizard" ("Wizard"). She indicated that she had made an appointment with a bankruptcy attorney since he had not agreed to sign the listing agreement.

{¶ 8} Teri failed to pay the mortgage payments on the Stanwick property in August, September, and October 2014, nor did she contribute to any mortgage payments or upkeep thereafter, between the time she left and when the house was sold in March 2015.

{¶ 9} In September and October 2014, the parties discussed the possibility that Jonathan might be interested in the Stanwick property. On October 10, 2014, they met so that Jonathan could inspect the property. When they arrived, the parties discovered that the utilities had been shut off and there was no electricity. When they left the house, Jonathan asked Teri for a key to the house, but she refused to give him a key unless he agreed in writing to take possession of the house.

{¶ 10} The following day, Jonathan sent Teri a message through Wizard, indicating that it was impossible to inspect the property without the utilities having been turned on. He also expressed concern about damage to the property, and asked her to fill out a residential disclosure form, since he had not lived in the property for more than a year. He sent Teri another message on October 17, 2014, stating that the utilities needed to be restored and that the yard needed to be maintained. He further stated that if she did not act, he would be required to do so, in order to protect his interest in the property. Teri

did not respond.

{¶ 11} On October 20, 2014, Jonathan and his father went to the property to check its condition and to gain entry, if necessary. In their opinion, the home looked abandoned from the outside, with long grass, and leaves and sticks that had fallen in the yard. They were also concerned because below-freezing temperatures had been predicted. They called a locksmith, obtained access to the property, and changed the locks. Jonathan also had the utilities turned back on the following day, on October 21, 2014. Three days later, on October 24, 2014, Jonathan sent Teri a message through the Wizard, indicating that he had changed the locks, and that he would make sure she had access to the house if she needed it. Teri also had access to the house through a garage door opener.

{¶ 12} On October 24, 2014, Jonathan filed a motion for contempt with the trial court, based on Teri's alleged failure to pay the mortgage, utilities and maintenance costs; her alleged failure to transfer household goods and photos to him; and her alleged failure to pay various costs for their children. Jonathan also asked the court for an order permitting him to occupy the marital premises pending sale, and for attorney fees and costs. Subsequently, on October 27, 2014, Teri called the police to report that an unwanted suspect was at her property, even though she knew at the time that it was Jonathan. On November 3, 2014, Teri filed a motion for contempt against Jonathan, asking the court to hold him in contempt for failing to cooperate in the sale of the residence; for failing to split the proceeds of the sale of a 2003 van with her; and for failing to cooperate in dividing the marital portion of certain accounts. She also asked for attorney fees and court costs.

{¶ 13} The trial court held an evidentiary hearing on April 15, 2015. By then, the

property had been sold. Jonathan also withdrew the portion of his motion relating to unpaid costs for the children. In addition, Teri withdrew the part of her motion relating to division of the accounts. Following the hearing, the trial court found Teri in contempt for failing to pay the mortgage for the months of August through October 2014, and sentenced her to 10 days in jail. She was permitted to purge the contempt by paying Jonathan $3,717 within 90 days. The court also awarded Jonathan $1,000 in attorney fees.

{¶ 14} In addition, the court held Jonathan in contempt for failing to give Teri her share of the profit from the sale of the van, and sentenced Jonathan to 10 days in jail. Jonathan was permitted to purge the contempt by paying Teri $2,850 within 90 days. The court also awarded Teri $1,000 in attorney fees.

{¶ 15} Both sides appealed from the trial court's decision, but Teri dismissed her cross-appeal.

## II. Application of Clean Hands Doctrine

{¶ 16} Jonathan's First Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion by Finding Appellant

in Contempt When Appellee Did Not Have Clean Hands.

{¶ 17} Under this assignment of error, Jonathan argues that the trial court erred in finding him in contempt concerning the sale of the van, because Teri refused to cooperate in the sale. Specifically, she refused to turn over the title, and did not respond to a number of communications.

{¶ 18} "Contempt of court is defined as disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to

embarrass, impede or obstruct a court in the performance of its functions." *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55, 271 N.E.2d 815 (1971), paragraph one of the syllabus. "The purpose of contempt proceedings is to secure the dignity of the courts and the uninterrupted and unimpeded administration of justice." *Id.* at paragraph two of the syllabus. "Therefore, since the primary interest involved in a contempt proceeding is the authority and proper functioning of the court, great reliance should be placed upon the discretion of the trial judge." (Citation omitted.) *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 16, 520 N.E.2d 1362 (1988).

{¶ 19} "Although contempt proceedings are said to be neither civil or criminal, courts often need to classify them as either civil or criminal." *Owais v. Costandinidis*, 2d Dist. Greene No. 2014-CA-5, 2014-Ohio-4103, ¶ 84, citing *Denovchek* at 16. " 'If sanctions are primarily designed to benefit the complainant through remedial or coercive means, then the contempt proceeding is civil.' " *Id.,* quoting *Denovchek* at 16. "Normally, contempt proceedings in domestic relations matters are civil in nature because their purpose is to coerce or encourage future compliance with the court's orders." (Citations omitted.) *Fidler v. Fidler*, 10th Dist. Franklin No. 08AP-284, 2008-Ohio-4688, ¶ 11.

{¶ 20} " 'A prima facie case of civil contempt is made when the moving party proves both the existence of a court order and the nonmoving party's noncompliance with the terms of that order.' " *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 12 (2d Dist.), quoting *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 4. "A finding of civil contempt requires clear and convincing evidence that the alleged contemnor has failed to comply with the court's prior orders." (Citation omitted.)

*Moraine v. Steger Motors, Inc.*, 111 Ohio App.3d 265, 268, 675 N.E.2d 1345 (2d Dist.1996). Contempt decisions are reviewed for abuse of discretion. *Jenkins* at ¶ 12, citing *Wolf* at ¶ 4.

{¶ 21} In the case before us, there is no dispute that Jonathan failed to comply with the order in the separation agreement, which required him to split the proceeds of the van sale with Teri. Jonathan admitted that he failed to pay Teri, but his excuse was that he believed he could offset this amount against what she owed him on the property. This was not his decision, however, and in disobeying a court order, he took the risk that the court would disagree with his choice.

{¶ 22} "The unclean hands doctrine generally provides that when a party takes the initiative to set in motion a judicial action in order to obtain some remedy, the court will deny the remedy where the party seeking it has acted in bad faith by his or her prior conduct." (Citation omitted.) *Gardner v. Bisciotti*, 10th Dist. Franklin No. 10AP-375, 2010-Ohio-5875, ¶ 15. "Ohio courts have recognized that the doctrine may be applied in domestic relations cases." (Citations omitted.) *Id.* However, "courts have consistently held that the unclean hands doctrine does not apply in cases where a party has legal remedies available to address the misconduct of the party seeking the contempt finding." (Citation omitted.) *Id.* at ¶ 19.

{¶ 23} Unfortunately, neither party's conduct in this case was exemplary. If Jonathan felt that Teri acted improperly by failing to sign pertinent documents or cooperating in the sale of the van, he had the remedy of filing a contempt motion with the court. What he could not do was to unilaterally disregard the prior court order.

{¶ 24} Accordingly, the First Assignment of Error is overruled.

### III.    Offset of Costs Regarding the Van

**{¶ 25}** Jonathan's Second Assignment of Error states that:

The Trial Court Erred in Ordering Appellant to Pay One Half of the Sales Price of the Van to Appellee, Without Offsetting the Costs Appellant Incurred in Obtaining a Duplicate Title[,] Making Necessary Repairs, and Advertising the Van for Sale.

**{¶ 26}** Under this assignment of error, Jonathan contends that the trial court erred by failing to credit him with the costs that were incurred in connection with the sale of the van.    Again, we review contempt decisions for abuse of discretion.    *Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, at ¶ 12.    An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' "    (Citations omitted.)    *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).    However, abuses of discretion most commonly arise from decisions that are unreasonable.    *DiPasquale v. Costas*, 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682, ¶ 74 (2d Dist.)    (Citation omitted.)    "Decisions are unreasonable if they are not supported by a sound reasoning process."    *Id.*, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 27}** Concerning the van, Paragraph 5 of the Separation Agreement provides that:

The parties are joint owners of a 2003 Chevrolet Astro Van, upon which no debt exists and that the parties agree has an approximate value of $6,500.00.    Upon the filing of a judgment Entry and Final Decree of Divorce herein, Husband shall sell the vehicle and Wife shall cooperate in

the sale and transference of certificate of title to the vehicle. Husband and Wife shall equally divide the net proceeds from the sale of the vehicle. Until such time as the vehicle is sold, both parties shall be equally responsible for one-half the registration fees, insurance, and reasonable and necessary maintenance costs.

Doc. #55, Ex. A, Separation Agreement, p. 4.

{¶ 28} The van was sold in early October 2014 for $5,700. Jonathan testified that he incurred the following expenses in order to sell the van: $43 for a title from the Clerk of Courts; $43 for advertising; registration expenses of $64.50 so that the van could be driven to Lang's Chevrolet for testing and an estimate; car insurance for a period of about two months; and repairs that needed to be done in order to sell the car (shown on Exs. C and J). Although Teri offered nothing to challenge these amounts, the trial court ordered Jonathan to pay her one-half of the gross amount of the sale. This was an abuse of discretion, as it was not supported by sound reasoning. If expenses were incurred in selling the van, they should have been deducted, because the Separation Agreement refers to a division of "net" proceeds. Accordingly, the Second Assignment of Error is sustained.

## IV. Attorney Fees

{¶ 29} Jonathan's Third Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Awarding $1,000.00 in Attorney Fees Without Any Testimony Whatsoever as to the Time Expended by Her Attorney, Hourly Rate, or Reasonableness of the Costs.

{¶ 30} Under this assignment of error, Jonathan contends that the trial court erred in awarding $1,000 in attorney fees to Teri because she failed to present any testimony concerning the amount of fees expended for prosecution of the contempt action.

{¶ 31} Attorney fees may be awarded to parties who successfully move for civil contempt, and the award is reviewed for abuse of discretion. *State ex rel. Fraternal Order of Police Captain John C. Post Lodge No. 44 v. City of Dayton*, 49 Ohio St.2d 219, 229, 361 N.E.2d 428 (1977).

{¶ 32} At the contempt hearing, Teri testified that she had expended about $3,000 on attorney fees prior to the hearing. She did not present evidence as to the reasonableness of the fees, nor were any specific details about the fees discussed. However, we have permitted awards of small amounts of attorney fees without evidence of reasonableness. *See, e.g., Hoagland v. Hoagland*, 2d Dist. Miami No. 2014-CA-30, 2015-Ohio-2426, ¶ 19. Thus, even in the absence of evidence of reasonableness, the fee award would have been appropriate. In this regard, we note that Teri prevailed on her contempt motion, and the trial court awarded only one-third of the amount expended, which did not even include the cost of an evidentiary hearing that lasted several hours.

{¶ 33} Furthermore, Jonathan did present testimony from an attorney, who stated that $200 per hour would be a reasonable fee for the work being performed at the hearing, and that a normal hourly rate for attorneys in the area ranged from $150 to $350 per hour. Using the median figure of $200 per hour, Teri was thus awarded an amount compensating her for five hours of her attorney's work. The case had been pending for several months, involved pleadings, a pretrial, and discovery prior to the final hearing. Jonathan's own attorney fees were $2,580. Under the circumstances, the trial court's

award of $1,000 in attorney fees to Teri was not an abuse of discretion.

**{¶ 34}** Accordingly, the Third Assignment of Error is overruled.

V. Alleged Post-Decree Modification

**{¶ 35}** Jonathan's Fourth Assignment of Error states that:

The Trial Court Erred in Making a Post Decree Modification Set Forth

in the Parties' Separation Agreement that Had Been Incorporated into the

Final Decree of Divorce.

**{¶ 36}** Under this assignment of error, Jonathan contends that the trial court improperly modified the Separation Agreement by making both parties responsible for one-half of marital expenses after Jonathan allegedly took possession of the premises on October 21, 2014. Teri argues that this was not a modification but was a permissible interpretation of an ambiguous provision. She further maintains that even if the court modified the Separation Agreement, the modification was permissible under R.C. 3105.171(I).

**{¶ 37}** R.C. 3105.171(I) provides that:

A division or disbursement of property or a distributive award made

under this section is not subject to future modification by the court except

upon the express written consent or agreement to the modification by both

spouses.[2]

**{¶ 38}** Before being amended in 2010, R.C. 3105.171(I) provided that "[a] division or disbursement of property or a distributive award made under this section is not subject

---

[2] R.C. 3105.171 was amended after the divorce decree was filed, but subsection I was not changed. *See* Am.Sub.H.B. 64, 2015 Ohio Laws 11.

to future modification by the court." The 2010 amendments added the following language: "except upon the express written consent or agreement to the modification by both spouses." *See* Am. Sub. H.B. 238, Section 1, 2010 Ohio Laws 37.

{¶ 39} In a decision issued before the amendments, we held that the prohibition in R.C. 3105.371(I) was jurisdictional. *McKinney v. McKinney*, 142 Ohio App.3d 604, 608, 756 N.E.2d 694 (2d Dist.2001). In a post-amendment decision, we considered whether a trial court had erred in "reserving jurisdiction over the real estate." *Burke v. Burke*, 2d Dist. Champaign No. 2011-CA-2, 2011-Ohio-3723, ¶ 20. We concluded that the court's decision was "contrary to statutory authority for division of property." *Id.* In this regard, we first noted that the "property division appeared to be consistent with the parties' requests." *Id.* We then commented that:

However, with respect to each property, the journal entry states: "The court will retain jurisdiction over the real estate issue." The court could not "retain jurisdiction" over the real estate if to retain jurisdiction means reserving the ability to modify the property division. According to the Revised Code, "a division or disbursement of property or a distributive award made under this section is not subject to future modification by the court." R.C. 3105.171(I). We have held that this prohibition is jurisdictional. *See, e.g., McKinney v. McKinney* (2001), 142 Ohio App.3d 604, 608, 756 N.E.2d 694. This not-subject-to-modification provision has been amended to permit modification "upon the express written consent or agreement to the modification by both spouses." *McConnell v. McConnell*, Champaign App. No. 09–CA–43, 2010–Ohio–4757. But there is no

express written consent here. If a property division order is ambiguous, the trial court may properly clarify its meaning without violating R.C. 3105.171(I). *McKinney v. McKinney* (2001), 142 Ohio App.3d 604, 608, 756 N.E.2d 694. "An ambiguity exists when a provision in an order or decree is reasonably susceptible of more than one meaning." *Id.* at 609, 756 N.E.2d 694. At this juncture, there does not appear to be an ambiguity. Thus, the retention of jurisdiction was contrary to law.

*Burke* at ¶ 21. *Accord Merkle v. Merkle*, 5th Dist. Licking No. 13-CA-31, 2014-Ohio-81, ¶ 16 (holding that a trial court lacks statutory authority under R.C. 3105.171(I) "to reserve jurisdiction to modify or alter the division of marital and separate property, including retirement benefits, once the trial court enters the final divorce decree.")

{¶ 40} *McKinney* was decided before R.C. 3105.171(I) was amended, and *Burke* and *Merkle* both involve contested divorces, with no written agreement between the parties. In a post-amendment case involving an agreed judgment entry, the Fifth District Court of Appeals held that a trial court had jurisdiction to modify a qualified domestic relations order post-decree, because the parties had mutually agreed in the agreed judgment entry that the trial court "shall reserve and retain jurisdiction over [husband's] interest in the said Ariel Corporation Profit Sharing Plan to allocate (or re-allocate) all or part of such interest to [wife] for payment of spousal support herein and, or, to satisfy any unpaid spousal-support obligation of [husband] to [wife]. This Court further retains jurisdiction to modify or terminate these restraining orders, for reasons the Court determines, are just and equitable upon motion filed by [husband]." *Bittner v. Bittner*, 2015-Ohio-4707, ___ N.E.3d ___, ¶ 13-14 (5th Dist.).

{¶ 41} In contrast, the First District Court of Appeals has held that a general clause in "an agreed property settlement that granted 'continuing jurisdiction' to the domestic relations court over matters set forth in the agreement" was insufficient to overcome the statutory prohibition in R.C. 3105.171(I) against post-decree modifications. *Mees v. Mees*, 1st Dist. Hamilton No. C-130459, 2014-Ohio-2613, ¶ 1. In this regard, the court of appeals focused on the statutory language in R.C. 3105.171(I). Specifically, the court stated that:

> Underlying [Appellant's] argument is an assumption that the parties could, through appropriate language, authorize a court to make undefined, post-decree modifications to a property division. But that understanding is at odds with the statutory language. By its terms, the statute requires express consent "to the modification." The article is important here. The legislature did not merely insist that the parties authorize the court *to modify* the agreement. Instead, it required consent *to the modification*. The use of the word "the" makes it crystal clear that the parties must agree to the actual modification itself. In this case, the proposed modification was the change in the fee-splitting arrangement. Nowhere did the parties consent in writing to that change.

(Emphasis sic.) *Mees* at ¶ 6. One member of the panel dissented, contending that the language granting continuing jurisdiction was sufficient, and that any other conclusion would make the provision in the decree meaningless. *Id.* at ¶ 11 (Hendon, P.J., dissenting).

{¶ 42} Unfortunately, "Ohio does not maintain a comprehensive legislative history

of its statutes." (Citation omitted.) *State v. South*, 144 Ohio St.3d 295, 2015-Ohio-3930, 42 N.E.3d 734, ¶ 20. Instead, courts "rely on the language the General Assembly chose and * * * long-established rules of statutory construction." *Id.* In this regard, the Supreme Court of Ohio has stressed that:

> The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the lawmaking body which enacted it; and, where its provisions are ambiguous and its meaning doubtful, the history of legislation on the subject and the consequences of a literal interpretation of the language may be considered, punctuation may be changed or disregarded, words transposed, or those necessary to a clear understanding, and, as shown by the context, manifestly intended, inserted.

*Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph one of the syllabus.

**{¶ 43}** However, "the intent of the lawmakers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation. The question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact. That body should be held to mean what it has plainly expressed, and hence no room is left for construction." *Id.* at paragraph two of the syllabus.

**{¶ 44}** After examining the statute, we conclude that the language in R.C. 3105.171(I) is ambiguous, because the legislature's use of the article "the" could refer either to the parties' express written consent to a particular modification, or to the fact of

modification itself. The majority's comments in *Mees* favor the former interpretation. However, the latter interpretation is supported by the position of the dissent in *Mees*, and by the fact that it makes little sense for courts to retain jurisdiction to modify a property division merely for purposes of filing an agreement that the parties agree upon. One must also keep in mind the reality that parties in divorce cases are rarely in agreement, either before or after a decree.

{¶ 45} In this regard, we must emphasize that the parties do have to agree to give the court continuing jurisdiction to modify their property division. In addition, where the court enters a decree in a contested divorce after hearing evidence, the parties would clearly not have agreed to continuing jurisdiction, and the court could not provide in the decree that it would have the future ability to modify a property division.

{¶ 46} The parties can also restrict the extent of the court's ability to modify. For example, in *Paat v. Paat*, 5th Dist. Delaware No. 15 CAF 03 0025, 2016-Ohio-119, the parties gave the court continuing jurisdiction over the manner and terms of a sale of a marital home, including the sales price. *Id.* at ¶ 94. However, the court of appeals later construed this grant narrowly, and held that this did not give the trial court the ability to satisfy unpaid spousal support by redistributing the sale proceeds from the martial home. *Id.*

{¶ 47} As a further point, we note that to the extent any legislative history exists, it is not particularly enlightening, but does appear to indicate that the trial court may do more than simply file parties' agreements. H.B. 238 as originally passed by the Ohio House dealt only with amendment of R.C. 3105.171, and did not contain any modification provision in R.C. 3105.171(I). By the time the bill had been reported by the Senate

Judiciary – Civil Justice Committee, it had been expanded to include amendment of a number of other Revised Code Sections, and the language that currently appears in the statute had been added.

{¶ 48} The synopsis of the Committee Amendments for the Senate Judiciary Committee on Civil Justice indicates that the bill would do a number of things, including that it:

Authorizes the court in a divorce or legal separation proceeding to modify a division or disbursement of property or a distributive award upon the express written consent or agreement of both spouses.

Permits the spouses in a dissolution of marriage proceeding to include in the separation agreement authorization for the court to modify the division of property and requires that any modification be made only with the express written consent or agreement of both spouses.

http://archives.legislature.state.oh.us/analysis.cfm?ID=128_HB_238&ACT=As%20Enroll ed&hf=analyses128/h0238-rs-128.htm, discussing Sub.H.B. 238.

{¶ 49} The final bill analysis contains the same comments. http://archives.legislature.state.oh.us/analysis.cfm?ID=128_HB_238&ACT=As%20Enroll ed&hf=analyses128/10-hb238-128.htm. In addition, the Ohio Legislative Service Commission Fiscal Note & Local Impact Statement for Am.Sub.H.B. 238, as enacted, states that:

The purpose of the bill's property division provisions is to provide the court with the authority to address problematic circumstances that arise during the division or distribution of property. Based on information

provided by staff of the Judicial Conference of Ohio, the potential resulting effect would be an increase in the time and effort expended by the court to modify certain property division orders. From a fiscal perspective, the associated cost to the court is likely to be no more than minimal.

(Footnote omitted.) http://www.lsc.ohio.gov/fiscal/fiscalnotes/128ga/hb0238en.htm.

**{¶ 50}** The omitted footnote to this paragraph states that "[a]n example of a 'problematic circumstance' includes situations where a house will not sell or the purchaser cannot get a mortgage." *Id.*

**{¶ 51}** Again, while the legislative comments are not overly enlightening, they do indicate that the intent was to give trial courts the ability to modify property divisions. Accordingly, we conclude that under R.C. 3105.171(I) as amended, parties can agree to give the trial court post-decree jurisdiction over property divisions. However, the court's ability to modify the property division should be narrowly limited to the terms expressed in the agreement, due to long-standing principles surrounding the finality of decrees.

**{¶ 52}** Paragraph 4 of the Separation Agreement, which was incorporated into the decree, deals with "Real Property" and states as follows:

The parties are joint owners of real property ("marital residence") commonly known as 1115 Stanwick Drive, Beavercreek, Ohio 45430.

It is expressly agreed by and between the parties that Wife shall retain said marital residence free and clear of any claim of Husband. Upon the filing of a Decree of Divorce herein, Wife shall assume sole liability for and shall timely pay the mortgage obligations(s) to Union Savings Bank, or its successors and assigns, real estate taxes (including any which are

accrued and not yet due), insurance, utilities, maintenance costs and improvements for the marital residence, and Wife shall hold Husband harmless.

Further, Wife shall obtain refinancing of the first mortgage for the purposes of relieving Husband from any liability thereon. Said refinancing shall occur within ninety (90) days of the date of the filing of the Decree of Divorce herein. Husband shall execute and deliver to Wife a quit claim deed upon Wife's refinancing of the mortgage obligation(s).

In order to equitably account for the division of the parties' equity in the marital residence and thus, allow Wife to keep the residence free and clear of any claim by Husband, the parties agree said marital residence has an approximate fair market value of $162,000.00 and that a mortgage loan on the marital residence currently exists with an approximate balance of $140,000.00. The parties further agree that Husband contributed pre-marital assets to the marital residence in the amount of $6,000.00. In order to equitably account for the division of the parties' equity in the marital residence, and thus, allow Wife to keep the residence free and clear of any claim by Husband, Wife shall pay to Husband the sum of $16,000 upon refinancing the marital residence, within ninety (90) days of the date of filing of the Final Judgment Decree of Divorce herein.

In the event Wife is unable to obtain refinancing within ninety (90) days of the date of the filing of the Final Judgment Decree of Divorce herein, the parties shall forthwith list the residence for sale with a qualified real

estate broker and sell the residence for its fair market value at the earliest practicable time in order that the aforementioned mortgage(s) is paid in full. Husband shall fully and completely cooperate with respect to Wife's efforts to obtain this refinancing, including, but not limited to, the provision of any financial information, release or affidavits requested by prospective lenders. Upon closing of the sale of the residence, and after payment of the normal and customary costs of closing, Husband shall be entitled to receive the sum of $6,000.00 of the net proceeds, if any, free and clear of any claim of Wife. Thereafter, Wife shall receive fifty percent (50%) and Husband shall receive fifty percent (50%) of the remaining net proceeds free and clear of any claim of the other thereto. In the event a deficiency balance is owed after payment of normal and customary costs of closing, each party shall pay one-half of said deficiency and will hold the other harmless thereon.

The Court shall retain jurisdiction over this issue only to the extent necessary to effectuate the intent of the parties, specified above, and to achieve the complete equitable division of the parties' real property interests.

For the calendar year 2014, Husband shall be entitled to claim on his individual federal, state, and local tax returns all mortgage interest and real estate deductions on the marital residence that he has paid or earned prior to the date of the filing of a final Judgment Entry and Decree of Divorce herein. For the calendar year 2014, Wife shall be entitled to claim on her individual federal, state, and local tax returns all mortgage interest and real

estate deductions she has paid after, and including, the date of the filing of a Final Judgment Entry and Decree of Divorce herein. Wife shall be entitled to claim on her individual federal, state, and local tax returns all mortgage interest and real estate deductions on the marital residence commencing calendar year 2015.

Doc. #55, Ex. A, Separation Agreement, pp. 3-4.

{¶ 53} The agreement contemplated that Teri would assume responsibility for the mortgage payments on the premises following the divorce and would hold Jonathan harmless on the mortgage and expenses thereafter. The agreement further provided that Teri would attempt to refinance the property and if she were unable to do so, the property would be sold. The proceeds from the sale would then be divided equally between the parties, after Jonathan was given the first $6,000 of proceeds. The agreement obviously contemplated that Teri would continue to live in the premises until it sold, and even gave Teri the ability to claim the tax deductions for periods after the divorce, including the part of 2014 after the divorce, 2015, and periods thereafter.

{¶ 54} In its May 19, 2015 decision on the contempt matters, the trial court awarded Jonathan "exclusive possession" of the marital premises, even though the court was told at the April 2015 hearing that the property had been sold a few months previously. The court further concluded that the prior order making Teri responsible for all the costs of the premises in the marital decree would no longer be equitable. The court, therefore, held that both parties would each be responsible for one-half of the expenses as stated in the final decree, after Jonathan took control of the residence on October 21, 2014.

{¶ 55} As was noted previously, we review contempt decisions for abuse of discretion. *Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, at ¶ 12. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140. However, abuses of discretion most commonly arise from decisions that are unreasonable. *DiPasquale,* 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682, at ¶ 74. "Decisions are unreasonable if they are not supported by a sound reasoning process." *Id.*, citing *AAAA Ents., Inc.*, 50 Ohio St.3d at 161, 553 N.E.2d 597.

{¶ 56} As a preliminary matter, the trial court's decision awarding Jonathan possession of the marital premises was not supported by a sound reasoning process, because that part of Jonathan's motion for contempt was moot at the time of the hearing. The motion was filed in October 2014, and the property had been sold long before the hearing occurred in April 2015.

{¶ 57} Furthermore, although the separation agreement gave the trial court power to retain jurisdiction to ensure an equitable division of the property interests, the court's decision was not supported by a sound reasoning process. As was noted, the agreement contemplated that Teri would continue to live in the premises and hold Jonathan harmless on the mortgage obligation thereafter. The conclusion that Teri was expected to continue to reside in the premises is buttressed by the fact that she was entitled to take credit on her income taxes for sums incurred for property taxes and so on, after the divorce.

{¶ 58} Teri was not required to move from the premises, nor was she entitled under the terms of the agreement to stop paying for the mortgage and other expenses prior to

the time the property was sold. However, she voluntarily chose to vacate the premises in October 2014 and to stop paying thereafter on the mortgage.

{¶ 59} Furthermore, the trial court specifically noted in its decision that neither party lived in the premises after Teri left. Although an argument might be made that Jonathan could equitably be held responsible for payment on the mortgage and other expenses if he had moved into the premises and lived there until it was sold, this was not what occurred. Moreover, the agreement between the parties did not contemplate that Teri would be given credit for contributions she made toward the mortgage between the time she took possession and the time of sale. Instead, the agreement stated that if the property were sold (regardless of whether that occurred immediately or even years later), Jonathan would be entitled to the first $6,000 of proceeds, and the remaining equity would be equally split between the parties. As a result, there was nothing, under the circumstances, for the trial court to construe or upon which to exercise its limited power to modify.

{¶ 60} We have said that " 'trial courts may clarify ambiguous terms in divorce decrees * * *.' " (Citations omitted.) *Denmark v. Denmark*, 2d Dist. Montgomery No. 26438, 2015-Ohio-4292, ¶ 30. "An ambiguity exists when a provision in an order or decree is reasonably susceptible of more than one meaning." *McKinney*, 142 Ohio App.3d at 609, 756 N.E.2d 694. "When interpreting a divorce decree that incorporates the parties' separation agreement, * * * the normal rules of contract interpretation generally apply to ascertain the meaning of its language." (Citation omitted.) *Wallace v. Wallace*, 2d Dist. Greene No. 2006-CA-136, 2008-Ohio-205, ¶ 12. "Because the construction of a written contract is a matter of law, the same is reviewed without

deference to the trial court's determination." *Id.*, citing *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. "If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." (Citation omitted) *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9.

**{¶ 61}** We find nothing ambiguous in the Separation Agreement. As was noted, the agreement contemplates that Teri would continue to pay the mortgage payments and upkeep on the premises, and hold Jonathan harmless. The agreement also provided for a specific division of proceeds upon sale. Teri chose to abandon the premises and stop making payments. She may not have liked the terms to which she agreed, but they were not ambiguous.

**{¶ 62}** Accordingly, the Fourth Assignment of Error is sustained. On remand, the trial court should determine and award Jonathan the sums he paid for "the mortgage obligations(s) to Union Savings Bank, or its successors and assigns, real estate taxes (including any which are accrued and not yet due), insurance, utilities, maintenance costs and improvements for the marital residence * * * " between the date that Teri vacated the premises and the date the property was sold. Doc. #55, Ex. A, Separation Agreement, p. 3. The court should credit Teri for the amounts previously assessed against her, i.e., the mortgage payments for August, September, and October 2014.

VI. Attorney Fee Award to Jonathan

**{¶ 63}** Jonathan's Fifth Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion by Awarding only

$1,000.00 in Attorney Fees to Appellant When Appellant Offered Evidence of Attorney Fees Amounting to $2,850.00, and Where the Trial Court Failed to Explain Its Reasoning for the Award.

{¶ 64} Under this assignment of error, Jonathan contends that the trial court abused its discretion by awarding him the same amount of fees as were awarded to Teri, even though the work performed to prosecute his contempt action far exceeded the amount involved in Teri's claim.

{¶ 65} As was previously noted, we review attorney fee awards for abuse of discretion. *State ex rel. Fraternal Order of Police Captain John C. Post Lodge No. 44*, 49 Ohio St.2d at 229, 361 N.E.2d 428. Abuses of discretion most often arise from unreasonable decisions, i.e., ones that lack a sound reasoning process. *DiPasquale*, 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682, at ¶ 74.

{¶ 66} After reviewing the record, we find no abuse of discretion. In another situation involving cross-motions for contempt, we noted that "both parties were found to be in contempt as a result of the same hearing. Thus, the trial court's apparent conclusion that the parties' attorneys had invested roughly the same amount of time in the contempt proceedings was not manifestly unreasonable." *Galluzzo v. Galluzzo*, 2d Dist. Champaign No. 96-CA-16, 1997 WL 64033, *2 (Feb. 14, 1997). *See also Beyke v. Beyke*, 3d Dist. Union No. 14-05-13, 2005-Ohio-5465, ¶ 25 (in a case involving cross-motions for contempt, the trial court did not abuse its discretion by requiring the parties to pay their respective attorney fees.)

{¶ 67} We also note that some parts of Jonathan's contempt motion were withdrawn at trial or were moot, and the trial court was not required to award either side

the total amount of fees that were requested.

**{¶ 68}** Based on the preceding discussion, the Fifth Assignment of error is overruled.

## VII. Conclusion

**{¶ 69}** Jonathan's Second and Fourth Assignments of Error having been sustained, and his First, Third, and Fifth Assignments of Error having been overruled, the judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN, P.J. and HALL, J., concur.

Copies mailed to:

Michael A. Mayer
David S. Peterson
Robert K. Hendrix
Hon. Steven L. Hurley